# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 40239

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2013 Opinion No. 67** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: December 19, 2013** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| DERK WARNER HOWARD, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Gooding County. Hon. John K. Butler, District Judge.

Order denying motion to suppress, <u>affirmed</u>.

Anthony M. Valdez, Twin Falls, for appellant.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent. John C. McKinney argued.

---

WALTERS, Judge Pro Tem

Derk Warner Howard appeals from the district court's denial of his motion to suppress evidence of a marijuana grow located in his shed on the curtilage of his home. The plants were discovered by police after they went to his front door, knocked, and while at the front door, smelled fresh growing marijuana. Howard contends that under recent United States Supreme Court precedent, *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409 (2013), the police officers' entry onto the curtilage of his home and up to his front door (the location where an officer smelled the marijuana growing in the shed) was an illegal warrantless search and, in the alternative, further contends that a posted "no trespassing" sign eliminated any implied invitation for visitors to enter the curtilage of his home. Howard further challenges the district court's credibility determinations leading to the court's ultimate finding that the officers did not further intrude on the curtilage of the home after visiting the front door of the home. We affirm the denial of the motion to suppress.

1

# I.

# BACKGROUND

After Howard was charged with manufacturing marijuana, he moved to suppress drug evidence. At the suppression hearing, Detective Jared Sweesy and Trooper Steve Otto of the Idaho State Police; Howard; and Howard's acquaintance, Ben Hepworth, testified to the police officers' August 31, 2011, warrantless conduct at and around Howard's place of residence.

On August 30, 2011, Sweesy received an anonymous tip that there was marijuana being grown in a ravine proximate to the Howard residence, located in a rural area near the town of Bliss, Idaho. The tipster also provided Howard's name and the address of his home, which was the only residential structure for miles around. The next day, August 31, 2011, Sweesy, Otto, and a third officer, Detective Ward,[1] went to the scene in a single, unmarked police vehicle with the intent to search the ravine. The ravine and the Howard residence are accessible by a "Road" running between "old Highway 30" at a location to the southwest of the Howard residence to Spring Cove Road at a location nearby and to the northeast of the Howard residence. Because using the Spring Cove entrance would require the officers to drive right past the Howard residence on the Road, in order not to alert Howard to their presence, the officers decided to use the Highway 30 entrance.

Sweesy assumed, without checking, that the Road was a public road. It was not; the Road was and is a private road, running through property owned by neighbors. Howard's landlord enjoys an easement on the Road and Howard "maintains" it. In addition, there is a fence running on both sides of the "cattle guard" entrance to the Road off of Highway 30 and on the second fencepost to the left is a small "no trespassing" sign. Both Sweesy and Otto testified that they did not see this sign when they entered onto the Road.

The ravine runs east-west and is located to the southwest and directly south of the Howard residence at its end. The three officers drove up the Road about one-half mile to a "Y" intersection, turned off the Road to another road on the right, and drove up to the west-most side of the ravine. The officers then foot-searched the ravine to the east to its end (about another one-half of a mile) and found nothing. The officers walked back to the west to their vehicle and, in

---

[1]     Ward did not testify at the suppression hearing.

Sweesy's words, the officers "then made the decision that we would just contact Mr. Howard and advise him of, you know, the tip that we got and talk to him about it."

The officers then drove up the Road about another one-half mile to the Howard residence and parked at the head of Howard's driveway abutting the Road just to the south of the residence. Sweesy and Ward walked up to the residence and knocked on the front door. While at the door, Sweesy smelled fresh growing marijuana in the breeze blowing from the west. When no one answered, the officers returned to the Road.

The district court in its decision concluded that the curtilage of the Howard residence was essentially triangle-shaped, with the borders being a canal to the northeast of the home, fence posts without a fence running just north of and parallel to the Road to the south of the home, and, to the northwest, a "fence line" meeting the Road at its south-most point and the canal at its north-most point.[2] Because of his detection of marijuana odor while at the door to the Howard residence, Sweesy suspected that there was an active grow located in a shed located to the west and just to the north of the Howard home. At some point, Sweesy began to take photographs from the Road, starting at the driveway area and moving west to a point on the Road directly south of the shed, continuing down the Road to the corner of the Road and the fence line, and then up the west side of the fence line to the north ending at a location just to the west of the shed.[3] Both Sweesy and Otto testified that from the Road directly to the south of the shed they could see, with the naked eye, strings tied to the rafters of the building which are commonly used to support growing marijuana plants. Sweesy also said that when he ended up next to the shed to the west of the northwest "fence line" he could clearly see marijuana plants growing in the shed through slats in the walls of the dilapidated building.

In short, both Sweesy and Otto testified that after the initial warrantless officer entry onto the Howard curtilage to go up to the front door of the Howard residence and the return back to the Road, the officers did not again invade the curtilage of the residence. Howard and his witness, Ben Hepworth, testified differently. Hepworth, an acquaintance of Howard and also an employee of the canal company, said that he was driving past the residence on the canal lateral

---

[2]     In this appeal, Howard does not contend that the district court's determination of the size and location of the curtilage of his residence was erroneous.

[3]     All of this travel occurred outside of the curtilage of the residence, as determined by the district court.

when he noticed three people who he assumed were looking at Howard's vehicles for sale. Hepworth testified that he saw the three men on the east side of the fence line close up to the shed, and thus, according to Hepworth, within the curtilage of the property. Hepworth called Howard who arrived at the scene shortly thereafter. Similar to Hepworth, Howard testified that when he arrived, Detective Ward and Trooper Otto were on the curtilage of his property near the Road and Detective Sweesy was on the curtilage of his property up near the shed. Sweesy later confronted Howard with his detection of the odor of the marijuana while he was located at the front door and with his observations of the "strings" and the marijuana plants in the shed. Based upon these representations, Howard granted Sweesy consent to physically search the property and seize the marijuana plants.

Thus, Sweesy's and Otto's testimony contradicted the testimony of Hepworth and Howard as to whether any of the officers' further observations (most specifically Sweesy's observation of the marijuana plants) were made from within the curtilage. The district court found the officers' testimony more credible, crediting as true their testimony that, after returning to the Road from the front door of the house, they never again entered the curtilage of the home but instead restricted their movements to the Road and west of the fence line. In denying the motion to suppress, the district court held, in essence, that the cattle guard no trespassing sign was ineffective to keep the officers off of the Road, that Sweesy and Ward's entry onto the curtilage and travel to Howard's front door was lawful and, therefore, Sweesy's detection of the odor of growing marijuana from that vantage point was likewise lawful, and that the officers' viewing of and photographing of the shed was lawful because the officers did not further invade the curtilage to do so, but instead restricted their actions to the Road and to the west of the fence line. Therefore, concluded the court, Howard's consent to search was not constitutionally tainted[4] because the officers' observations leading to that consent were made from locations the officers had a right to be.

Howard entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. This appeal followed.

---

[4]    *See State v. Tietsort*, 145 Idaho 112, 117-18, 175 P.3d 801, 806-07 (Ct. App. 2007); *State v. Kerley*, 134 Idaho 870, 874-75, 11 P.3d 489, 493-94 (Ct. App. 2000).

## II.

## ANALYSIS

**A.** *Jardines*

Howard first contends that the United States Supreme Court's recent decision in *Jardines*, ___ U.S. ___ , 133 S. Ct. 1409[5] establishes that the officers' initial warrantless entry onto the curtilage of his property and travel to the front door, where marijuana odor was detected, constituted an illegal search in violation of the Fourth Amendment to the United Constitution. We conclude otherwise.

In *Jardines*, a detective, a canine officer and the officer's drug-sniffing dog walked up to the front door of the defendant's home. The officers had no warrant. While the three were at the door, the dog alerted for the presence of illegal drugs. Based upon the alert, the detective applied for and obtained a search warrant to search the home. Execution of the warrant revealed marijuana plants and Jardines was charged with trafficking in cannabis. Jardines moved to suppress, asserting his Fourth Amendment rights to be free from warrantless searches was violated by the officers' actions. The trial court granted the motion and the Florida Supreme Court affirmed. On certiorari, the United States Supreme Court, in a 5-4 decision, likewise affirmed.

The *Jardines* Court stated that "when it comes to the Fourth Amendment, the home is the first among equals" and "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, ___ U.S. at ___, 133 S. Ct. at 1414 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). And, the Court explained, the curtilage of the home--the area "immediately surrounding and associated with the home"--is regarded as "part of the home itself for Fourth Amendment purposes." *Jardines*, ___ U.S. at ___, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Further, the Court continued its commitment to the "physical intrusion" approach to the Fourth Amendment reenergized in *United States v. Jones*, 565 U.S. ___, ___, 132 S. Ct. 945, 952 (2012). *Jardines*, ___ U.S. at ___, 133 S. Ct. at 1414. The Court said:

---

[5] The district court here was without the benefit of *Jardines* because the Supreme Court issued its decision on March 26, 2013, long after the suppression hearing and entry of the district court's order on the suppression motion in this case.

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States v. Jones*, 565 U.S. ___, ___, n.3, 132 S. Ct. 945, 950-951, n.3, 181 L. Ed. 2d 911 (2012). By reason of our decision in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), property rights "are not the sole measure of Fourth Amendment violations," *Soldal v. Cook County*, 506 U.S. 56, 64, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992)--but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government *does* engage in [a] physical intrusion of a constitutionally protected area," *United States v. Knotts*, 460 U.S. 276, 286, 103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983) (Brennan, J., concurring in the judgment).

*Jardines*, ___ U.S. at ___, 133 S. Ct. at 1414. The Supreme Court further explained:

That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house--in the curtilage of the house, which we have held enjoys protection as part of the home itself. *And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.*

*Id.* (emphasis added).

In its further analysis, the Court stated that "since the officers' investigation took place in a constitutionally protected area, we turn to the question of whether it was accomplished through an unlicensed physical intrusion." *Id.* at ___, 133 S. Ct. at 1415. The Supreme Court explained that because there ordinarily exists an *implicit* license for everyday visitors to, within some limitations, enter upon the curtilage of a home so too can the police. Specifically, the Court explained:

"A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136, 43 S. Ct. 16, 67 L. Ed. 167 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S. Ct. 920, 95 L. Ed. 1233 (1951). *This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.* Complying with the terms of that traditional invitation does not require

6

fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. ___, ___, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011).

*Jardines*, ___ U.S. at ___, 133 S. Ct. at 1415-16 (emphasis added, footnote omitted).

Ultimately, the Supreme Court concluded that an illegal Fourth Amendment search had occurred because the officers' conduct while on the curtilage of Jardines' home exceeded the scope of any implicit license and further (and importantly) that the officers' "behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.* at ___, 133 S. Ct. at 1417. Specifically, the Court held that the police act of approaching a home and knocking is one thing:

> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to--well, call the police. The scope of a license--express or implied--is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id.* at ___, 133 S. Ct. at 1416 (footnote omitted).[6]

The analysis and holdings of *Jardines* distinguish it from the facts involved in this case. Here, the officers approached the home by the customary path, knocked, waited briefly to be received, and then (when no one answered) left. Thus, because the officers' conduct fell within that granted by their implicit license as explicitly recognized by *Jardines*, an objective view of that conduct reveals no purpose to conduct a search.

---

[6] The Court emphasized that "it is not the dog that is the problem, but the [officers'] behavior that here involved the use of the dog," suggesting that its conclusion would be no different had the officers' been found "snooping around the front porch *with or without* a dog." *Jardines*, ___ U.S. at ___ n.3, 133 S. Ct. at 1414 n.3.

While Howard suggests that Sweesy's detection of the odor of marijuana while at his front door "is no different than the drug sniffing dog alerting on Mr. Jardines' front porch," the *Jardines* opinion itself directs that this is not so. The Supreme Court explained that its prior case law establishes "that it is not a Fourth Amendment search to approach the home in order to speak with the occupant" and that "the mere 'purpose of discovering information' . . . in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment." *Id.* at ___ n.4, 133 S. Ct. at 1416 n.4. In her concurring opinion and in response to a complaint by the dissent, Justice Kagan stated the matter even more directly when she said that if officers at the front door "can smell drugs coming from a house, they can use that information; a human sniff is not a search, we can all agree." *Id.* at ___ n.2, 133 S. Ct. at 1419 n.2 (Kagan J., concurring). Howard has failed to show that the officers' conduct in their initial entry onto the curtilage of his home violated the Fourth Amendment.

**B.** **Whether Howard Revoked His "Implied Consent" for People to Enter the Curtilage of His Property by a Posted No Trespassing Sign at the Cattle Guard Entrance to the Road**

The discussion in the preceding section dovetails nicely into Howard's next claim of error. Howard next contends, in the alternative, that because there was a no trespassing sign posted where the officers entered the Road at the cattle guard entrance, he effectively revoked any implied consent for anyone (including the police) to enter the curtilage of his home located at the other end of the Road.

In support of his argument, Howard cites *State v. Christensen*, 131 Idaho 143, 953 P.2d 583 (1998). In that case, two detectives went to the area of Christensen's home to investigate a tip of a marijuana grow and to further their investigation decided to visit Christensen's home and speak to him. One of the detectives entered the curtilage of the home, but to walk down the driveway the detective had to step over or around a closed but unlocked gate on which was posted a "no trespassing" sign. While on the property, the detective spotted a marijuana grow and Christensen was charged with manufacturing a controlled substance. The district court denied Christensen's subsequent motion to suppress but on appeal the Idaho Supreme Court reversed, holding "that this is not a case where the message to the public was ambiguous. The no trespassing sign was clearly posted on a gate across the only public access to the property." *Id.* at 147, 953 P.2d at 587. The Court further held that:

> Although we agree that there is an implied invitation for the public to use normal access routes to a house, this implied invitation is not irrevocable. We believe that the reasonably respectful citizen when confronted with a closed gate and a no trespassing sign does not proceed further, but respects the request for privacy that such efforts convey.

*Id.*

We disagree with Howard's contention that *Christensen* compels a finding of revocation of an implied license under the facts of this case. In that case the no trespassing sign was located at the entrance to the defendant's curtilage and, as our Supreme Court emphasized, the sign was "clearly posted" so that the message to the public was "unambiguous." *Id.* Here, in contrast, the "no trespassing" sign at issue was not clearly posted in that it was very small and not easily noticed. In addition, Howard himself did not post the sign, the sign was not posted over or next to the entrance to the Road but instead it was attached to the second fencepost over. Under these circumstances, as noted by the district court, the "message" conveyed by the sign was ambiguous in that it could just as easily be interpreted to convey to the public to stay off of the land behind the fence; land that Howard did not own. In addition, because the sign was located over one mile from Howard's home, it cannot be said that the sign unambiguously conveyed a message to the public not to enter the curtilage of the home located (nearly) at the other end of the Road. Following the directives of *Christensen*, we hold that Howard has failed to show that he effectively revoked the implied invitation to enter his home property.

## C. Credibility

Finally, Howard contests the district court's findings that his testimony and Ben Hepworth's testimony that they observed the officers on the curtilage of the property near the shed lacked credibility. Both Sweesy and Otto testified that they made no such entry and the district court found the officers' testimony more credible, crediting as true their testimony that, after returning to the Road from the front door of the house, they never again entered the curtilage of the home but instead restricted their movements to the Road and west of the fence line. Howard's specific complaint is that the district court made these findings based upon the court's reasoning that because particular vehicles were not depicted in certain photographs taken by Detective Sweesy, Howard's and Hepworth's testimony was less likely to be true. Howard takes exception to the complete accuracy of the district court's recitation of testimony regarding when these photographs were taken and to the district court's overall reasoning in general.

The power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999). The district court is the arbiter of conflicting evidence; its determination of the weight, credibility, inference, and implications thereof will not be supplanted by this Court's impressions or conclusions from the written record. *Johannsen v. Utterbeck*, 146 Idaho 423, 432, 196 P.3d 341, 350 (2008).

Applying these standards, Howard's complaints are beyond our standard of review. We do not view it the role of this Court to find error by dissecting the district court's reasoning and parsing out inconsistencies. The district court's overall determination concerning the conflicting testimony was that the officers' testimony was more credible than was Howard's and his friend Hepworth. This determination and the factual finding that flows therefrom lie within the province of the trial court and will not be disturbed on appeal.

### III.

### CONCLUSION

The district court did not err in denying the motion to suppress. The judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge GRATTON **CONCUR.**