**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 41402**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2014 Opinion No. 54** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: July 10, 2014** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| DENNIS EARL HIEBERT, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Bonner County. Hon. John T. Mitchell, District Judge.

Judgment of conviction for possession of a controlled substance, <u>affirmed</u>.

Rex A. Finney of Finney, Finney & Finney, P.A., Sandpoint, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

MELANSON, Judge

Dennis Earl Hiebert appeals from his judgment of conviction for possession of a controlled substance. Specifically, he alleges that the district court erred in denying his motion to suppress because the grounds supporting the warrant to search his property were gained from an unconstitutional warrantless search. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

Hiebert is the owner of a junk and salvage yard known as "Mr. D's." Hiebert also resides on the property. After receiving a tip that two fugitive felons might be on Hiebert's property, three officers entered onto the property during normal business hours through an open gate that had an "open" sign on the front. One of the officers approached a building in the front and knocked on the door, but there was no answer. The officer then walked further down the driveway into the junk yard, passing a "stop" sign, a "no thru traffic" sign, and a small "no trespassing" sign. The officer was checking to see if someone with information about the two

1

felons was elsewhere on the property as, on prior occasions, officers had encountered workers in the back of the junk yard area.

As the officer walked along the dirt pathway of the junk yard, he noticed a clean, late model vehicle in good condition that had no license plates and appeared out of place amongst the mostly dilapidated vehicles in the yard. The vehicle was partially hidden behind two other vehicles and between two trailers, but the front of the vehicle could be clearly seen from the pathway. The officer left the pathway and approached the vehicle, which was approximately 15 to 30 feet away. The officer saw through the vehicle windows that the steering column was opened and a screwdriver lay nearby on the driver's side floorboard. Suspecting that the vehicle was stolen, the officer ran the Vehicle Identification Number (VIN), which was visible from outside the vehicle. Dispatch confirmed that the vehicle was stolen. Additionally, another officer observed several license plates that returned as registered to vehicles different from the ones to which they were affixed.

Based on this information, two search warrants were issued for various parts of Hiebert's property, including his residence. Methamphetamine, several other stolen vehicles, and stolen vehicle parts were discovered during execution of the warrants. Hiebert was charged with seven counts of grand theft by possession of stolen property and one count of possession of a controlled substance.

Hiebert filed a motion to suppress all of the evidence in the case, arguing that the evidence supporting the probable cause to issue the search warrants was gained from an unconstitutional warrantless search. Specifically, he argued that the officers violated his reasonable expectation of privacy by entering into the junk yard portion of his property, and even if that entry was proper, one of the officers exceeded any implied invitation to enter by leaving the normal access route to inspect a vehicle. The district court denied the motion, finding that Hiebert did not have a legitimate expectation of privacy in the area accessed by the officers, as it was open to the public and there was an implied invitation to enter the property. Additionally, the district court determined that the officer's observation of the vehicle was made from a lawful vantage point under the open view doctrine.

Pursuant to a plea agreement, Hiebert pled guilty to possession of a controlled substance, I.C. § 37-2732(c)(1), preserving his right to appeal the order denying his motion to suppress. The remaining charges were dismissed. The district court sentenced Hiebert to a unified term of

2

five years, with a minimum period of confinement of two years. The district court then suspended the sentence and placed Hiebert on probation for four years. Hiebert appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

Hiebert argues that all of the evidence in his case, including that obtained from the search warrants, should be suppressed as the products of an unconstitutional warrantless search.[1] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 17, of the Idaho Constitution is virtually identical to the Fourth Amendment, except that "oath or affirmation" is termed "affidavit." In order for a search warrant to be valid, it must be supported by probable cause to believe that evidence or fruits of a crime may be found in a particular place. *State v. Josephson*, 123 Idaho 790, 792-93, 852 P.2d 1387, 1389-90 (1993).

---

[1]     Hiebert alternatively argues that, because the initial search warrant listed the incorrect address--3700 Highway 41, Oldtown, Idaho, as opposed to the correct address of 37000 Highway 41, Oldtown, Idaho--the original search warrant was defective and the evidence obtained from it should be suppressed. However, Hiebert fails to support this argument with any authority. A party waives an issue on appeal if either authority or argument is lacking. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). Accordingly, this argument is waived on appeal and will not be addressed further.

When a warrant is predicated on information discovered during a previous warrantless search, the State must show that the evidence supporting the warrant was not itself unlawfully obtained. *State v. Tietsort*, 145 Idaho 112, 116, 175 P.3d 801, 805 (Ct. App. 2007); *see also State v. Johnson*, 110 Idaho 516, 526, 716 P.2d 1288, 1298 (1986). That is, the State bears the burden of demonstrating that the initial, warrantless search fell within a well-recognized exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Halen v. State*, 136 Idaho 829, 833, 41 P.3d 257, 261 (2002); *State v. Prewitt*, 136 Idaho 547, 550, 38 P.3d 126, 129 (Ct. App. 2001).

Hiebert argues that, because the officers did not restrict their movements to the normal access routes and places where an ordinary visitor would reasonably be expected to go, their entry upon his property violated his constitutional rights. This claim is allegedly manifest in two specific instances of the officers' conduct: first, when the officers failed to leave the property after receiving no response at the front shop, instead walking beyond the "stop," "no thru traffic," and small "no trespassing" signs into the back of the junk yard; and second, when one of the officers strayed from the normal travel route of the dirt pathway to investigate the stolen vehicle.[2]

## A.     Entering the Junk Yard

Initially, Hiebert argues that the officers failed to leave the premises--as normal visitors would reasonably be expected to do--after receiving no response upon approaching one of the front buildings, knocking, and waiting briefly to be received. *See Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1416 (2013) (holding that the implied license to approach typically permits approaching by the normal access route, knocking promptly, waiting briefly to be received, and then leaving absent an invitation to linger longer); *State v. Howard*, 155 Idaho 666, 671, 315 P.3d 854, 859 (Ct. App. 2013) (citing to *Jardines* for this same proposition). However, this ignores the unique context in which this case occurs. Unlike in *Jardines* or *Howard*, which

---

[2]     In its briefing opposing the motion to suppress below, the state conceded that the driveway and paths leading to Hiebert's home fell within its curtilage. On appeal, neither party argues whether the dirt pathways of the commercial junk yard behind Hiebert's residence fall within the curtilage. Although it is unlikely that the entire business portion of a property would fall within even Idaho's expansive definition of the curtilage of a residence, for the purposes of this appeal and because it does not change the outcome in this case, we assume--without deciding--that the entire junk yard falls within the curtilage.

4

both involved police entry onto the curtilage of a normal residence, this case involves a residence located on property that has been opened to the public for business purposes. As a result, the expectation of what an ordinary visitor (in many cases, a customer of the business) might reasonably do is expanded. When an individual lives on the same property as his or her place of business, it is reasonable to expect that an ordinary visitor may look for the proprietor of the business somewhere on the property where he or she might be working. *Cf. Doe v. State*, 131 Idaho 851, 854, 965 P.2d 816, 819 (1998) (finding that it was reasonable for officers to look for a minor suspected of robbery on his family dairy farm in an area where he might be found working, such as an illuminated barn). Indeed, it is entirely reasonable to expect an ordinary customer to travel the available, unobstructed access routes of the property to inspect the wares of the business that are open to the public and within view of those established access routes.

In this case, Hiebert operates a business that is open to the public, creating an implied--if not explicit--invitation to enter upon his property and travel in the established pathways of the business. Indeed, the officers passed through an open gate with a clearly visible "open" sign during normal business hours. Although Hiebert's father, who also lives on the property, testified that the back of the junk yard is closed to the public and that people are supposed to stop at the shop, the question is what an ordinary visitor to the business property, not knowing the subjective intent of the owner, would have objectively perceived as reasonable conduct. The officers stopped their vehicles near the posted "stop" and "no thru traffic" signs, obeying the admonitions to take their vehicles no further into the property. The officers then approached at least one of the two front buildings by the established pathway, knocked, and announced their presence.[3] Receiving no reply, the officers walked toward the back of the property in search of the proprietor of the business, as prior experience had taught them that workers could often be found in the back junk yard portion of the property. Under the circumstances, an ordinary visitor to the business could be reasonably expected to do the same.

Hiebert also asserts that, by the officers' foray into the junk yard beyond the "stop," "no thru traffic" and small "no trespassing" signs, they entered upon areas of the property to which

---

[3]     During the suppression hearing, the officer that discovered the stolen vehicle initially testified that he and another officer had approached only what they thought was the main residence at the location, but later testified that he and another officer had each knocked at the two front buildings. This discrepancy has no bearing on the outcome of this case.

the implied invitation to enter had been revoked.  We disagree.  Posting "no trespassing" signs may indicate a desire to restrict unwanted visitors and announce one's expectations of privacy. *State v. Rigoulot*, 123 Idaho 267, 272, 846 P.2d 918, 923 (Ct. App. 1992); *see also State v. Kelly*, 106 Idaho 268, 275, 678 P.2d 60, 67 (Ct. App. 1984).  However, those signs cannot reasonably be interpreted to exclude normal, legitimate inquiries or visits by ordinary individuals, including police officers, who restrict their movements to the areas normally used by a reasonable visitor. *Rigoulot*, 123 Idaho at 272, 846 P.2d at 923.  Moreover, where a "no trespassing" sign is ambiguous and not clearly posted, the implied invitation to enter the curtilage of a home via the normal access routes is not revoked.  *Howard*, 155 Idaho at 672, 315 P.3d at 860.

In *Howard*, the defendant alleged that he had revoked the implied invitation to enter his property by posting a "no trespassing" sign where officers entered his property.  The sign was posted past the entrance to the gate on the second post of a fence to the side of the road entering the property.  In rejecting the defendant's assertion, we noted that the sign was not clearly posted because it was small and placed in a location away from the entrance in which it would not easily be noticed.  *Id.*  Moreover, we noted that the placement of the sign created an ambiguous message, as it was located over a mile from the defendant's residence and could just as easily have been interpreted to convey to the public to stay off of the land behind the fence to which it was attached.  *Id.*

Here, the "no trespassing" sign was posted on a shed beyond the front buildings and to the left of the main driveway.[4]  Based on the photographic exhibits in the record, the small sign was not easily visible to someone walking up the driveway toward the back of the property.  The officer did not testify whether he saw the small sign.  However, as in *Howard*, the sign's placement created an ambiguous message, as a reasonable visitor who did see the sign would be uncertain of whether the sign prohibited trespassing into the building on which it was attached, the small driveway to the left of the sign, or the back of the property.  Also, as previously noted, the officers restricted their movements to the clearly established pathways upon which normal

---

[4]     Hiebert notes that the officers passed "stop" and "no thru traffic" signs in addition to the small "no trespassing" sign, and he argues that the combination of the signs should have made clear that any implied invitation was revoked.  However, "stop" and "no thru traffic" signs are generally used for vehicular--not pedestrian--traffic, so it is unlikely that they would be interpreted by normal visitors to the business as precluding them from proceeding on foot.  This is especially true in light of the ambiguous and obscure placement of the "no trespassing" sign.

visitors might reasonably be expected to travel under the circumstances. In light of these facts, more than an ambiguous and obscure "no trespassing" sign is required to effectively revoke the implied invitation to enter part of a property that has been opened for business purposes. Accordingly, Hiebert has failed to show that the officers' entrance into the junk yard portion of the property violated his constitutional rights.

**B.      Leaving the Normal Access Routes**

Hiebert further alleges that one of the officers intruded upon Hiebert's constitutionally protected privacy interests by departing from the normal access routes of the junk yard to inspect the stolen vehicle. Fourth Amendment protection extends to the "curtilage" of a residence, which is the area or buildings immediately adjacent to a home that a reasonable person may expect to remain private even if accessible to the public. *United States v. Dunn*, 480 U.S. 294, 301 (1987); *Rigoulot*, 123 Idaho at 272, 846 P.2d at 923. Our courts have interpreted "curtilage" under Article I, Section 17, of the Idaho Constitution to include outbuildings and drives within the areas protected from unreasonable searches, affording more protection than does the United States Supreme Court's narrower interpretation of "curtilage" under the Fourth Amendment. *State v. Webb*, 130 Idaho 462, 467, 943 P.2d 52, 57 (1997); *State v. Cada*, 129 Idaho 224, 230-32, 923 P.2d 469, 475-77 (Ct. App. 1996).

However, even under the Idaho Constitution, the presence of a police officer within the curtilage does not, by itself, result in an unconstitutional intrusion. *State v. Clark*, 124 Idaho 308, 313, 859 P.2d 344, 349 (Ct. App. 1993). Under the open view doctrine, when the police come onto private property to conduct an investigation (or for some other legitimate purpose) and restrict their movements to places ordinary visitors could be expected to go, observations made from such vantage points do not implicate the Fourth Amendment. *State v. Linenberger*, 151 Idaho 680, 683, 263 P.3d 145, 148 (Ct. App. 2011); *Tietsort*, 145 Idaho at 115, 175 P.3d at 804. There is an implied invitation for the public to use access routes to the house, such as parking areas, driveways, sidewalks, or pathways to the entry and there can be no reasonable expectation of privacy as to observations made from such areas. *Clark*, 124 Idaho at 313, 859 P.2d at 349; *see also State v. Christensen*, 131 Idaho 143, 147, 953 P.2d 583, 587 (1998). This implied invitation extends to use of the normal access routes of businesses and commercial operations open to the general public. *See State v. Ashworth*, 148 Idaho 700, 703, 228 P.3d 381,

384 (Ct. App. 2010) (noting that the implied invitation to the general public to enter business or commercial premises may be limited to members of a club for which the business is operated).

Like other citizens, police with legitimate business are entitled to enter areas of the curtilage that are impliedly open to public use. *Clark*, 124 Idaho at 313, 859 P.2d at 349. A criminal investigation is a legitimate societal purpose. *Doe*, 131 Idaho at 854, 965 P.2d at 819; *Rigoulot*, 123 Idaho at 272, 846 P.2d at 923. Moreover, police officers without a warrant are permitted the same range of deviation from the normal access routes that could reasonably be expected of other respectful citizens. *Clark*, 124 Idaho at 316, 859 P.2d at 352. Only a substantial and unreasonable departure from the normal access routes will exceed the scope of the implied invitation and intrude upon constitutionally protected privacy interests. *Id.* at 314, 859 P.2d at 350. What is lawfully seen in open view may furnish probable cause for a subsequent search warrant. *Doe*, 131 Idaho at 854, 965 P.2d at 819.

Here, the officer remained on the well-traveled dirt pathways of the junk yard until he spotted a vehicle that looked out of place. The vehicle was clearly visible from the normal access route. The vehicle was a late model, clean, and in good condition--entirely inconsistent with the surrounding dilapidated vehicles. This made the vehicle stand out to the officer, just as it likely would have stood out to a potential customer in search of parts in the junk yard. Like a potential customer might do, the officer traveled a short distance off the normal access route--approximately 15 to 30 feet--to more closely inspect the vehicle. Indeed, it is entirely reasonable to expect that customers of a business like Hiebert's would feel free to look around and closely inspect items they may be interested in purchasing. The officer did not go into an area to which access was obstructed, nor did the officer go any further than required to inspect the out-of-place vehicle. The officer did not enter or search the vehicle in any way, instead observing from a lawful vantage point the disassembled steering column, the screwdriver on the driver's floorboard, and the VIN.[5] Thus, the officer's deviation from the normal access route was neither substantial nor unreasonable, as he acted in a manner and degree that could reasonably be expected of a normal visitor to the business property. As a result, his open view

---

[5] The inspection of an automobile to obtain its VIN is not a search under either the Idaho or United States Constitution, as there is no reasonable expectation of privacy in the VIN. *New York v. Class*, 475 U.S. 106, 113-14, 118-19 (1986); *State v. Martinez*, 136 Idaho 436, 442, 34 P.3d 1119, 1125 (Ct. App. 2001).

observations of the vehicle, which were used to support the search warrants, were made from a lawful vantage point and did not violate Hiebert's reasonable expectation of privacy.

## IV.

## CONCLUSION

The officers' entrance onto Hiebert's property was not a violation of his rights under either the state or federal constitution. His posting of an ambiguous "no trespassing" sign was insufficient to revoke the implied license to enter inherent in a business operation opened to the public. Finally, the officers restricted their movements to the normal access routes upon which ordinary visitors to the business property could reasonably be expected to go and did not substantially or unreasonably deviate therefrom. Therefore, the district court did not err in denying Hiebert's motion to suppress. Accordingly, Hiebert's judgment of conviction for possession of a controlled substance is affirmed.

Chief Judge GUTIERREZ and Judge GRATTON, **CONCUR.**