TYMKOVICH, Chief Judgé,
concurring.
I concur with the lead opinion, but write separately to explain more precisely my thinking on the novel question presented by this case.
Because the license to walk up to the front door is “implied from the habits of the country,” Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1415, 185 L.Ed.2d 495 (2013), we presume that every homeowner has granted that license absent any contrary indication. See id. (“[T]he knocker on the front door is treated as an invitation or license to attémpt an entry.”). Thus, the homeowner has the burden of showing that he has opted out of “the habits of the country.” See Dan B. Dobbs, The Law of Torts 220 (2000) (noting that failure to “show your dissent from the general custom of the community” can “reasonably be taken to import consent” to its continued application to you). Because revocation deviates from the background norm, the property owner must, make his revocation plain.
To me, the court must deploy an objective test, asking whether a reasonable person would conclude that entry onto the curtilage — the front porch here — by police or others was categorically barred. In other words, we look to each case’s facts to determine whether the reasonable person would think the license had been revoked. And the question presented by this case is whether “No Trespassing” signs in the circumstances here communicates a categorical bar that is clear that, no one would step on the front porch. In my view, this is a question of context: the time, place, manner, and circumstance-of the encounter.
I agree with Judge Ebel that Carloss failed to show that the implicit license to access the front porch was revoked. The Restatement of Torts helps frame the scope of this inquiry. A license created by a landowner to enter land can be terminated by a “revocation of [his] consent,”, of which a would-be. visitor “knows or has reason to know.” Restatement (Second) of Torts § 171(b) (1965). Specifically, a would-be visitor must know or have reason to know that the homeowner “has done an act” that is "necessarily inconsistent with a continuance of the consent.” Id. cmt. b. A visitor has “reason to knoyr” when he “has information from which a person of reasonable intelligence ... would infer that [the homeowner revoked the license].” Id. § 12.
The signs in this case of course communicated variants of the phrase “No Trespassing.” But in light of the strong social presumption that a visitor to a residential neighborhood can enter the front porch curtilage to knock, I doubt a reasonable, lawful visitor would believe that “No Trespassing” ' eliminated that presumption in every instance. Every reasonable person knows — even without seeing a “No Trespassing” sign — that one cannot trespass on private property. But that knowledge coexists with knowledge of the equally well-established principle that one may generally enter the curtilage to knock. A reasonable observer could also understand a “No Trespassing” sign as restating the “no- *1000 trespassing” -principle without thinking it had any bearing- on the implicit license to enter the curtilage for social reasons.[1] In a residential context, the intention of the homeowner who posts signs, without more, seems inadequate to revoke the license. See, e.g., State v. Hiebert, 156 Idaho 637, 329 P.3d 1085, 1090 (App.2014) (noting that “where a ‘no. trespassing’ sign is ambigur ous and not clearly posted, the implied invitation to enter the curtilage of a home via the normal access routes is not revoked”). I emphasize that it is not my view that a “No Trespassing” sign will never indicate the revocation of the implied license. Rather, the circumstances of this case do not indicate a revocation occurred such that the police could not reasonably believe entry was pérmissible.
The Supreme Court acknowledges this point in several cases explaining the curtilage rule. In Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), for example, the Court found that a landowner’s property rights did not exclude police despite the fact the owner “erected fences and ‘No Trespassing’ signs around the property.” Id. at 182, 104 S.Ct. 1735. “Nor is the government’s intrusion upon an open field a ‘search’ in the constitutional sense because that intrusion is a trespass at common law. The existence of a property right is but one element in determining whether expectations of privacy are legitimate.” Id. at 183, 104 S.Ct. 1735. See also United States v. Durni, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (police crossed barbed wire and wooden fences accessing barn outside curtilage).
Of course, the right facts could remove that-ambiguity. For example, a “No Trespassing” sign posted on a fence encircling a property imparts a different message than the same sign standing alone. And a closed or locked gate, especially in the residential context, imparts more information to the reasonable observer. See, e.g., State v. Christensen, 131 Idaho 143, 953 P.2d 583, 587-88 (1998) (holding that “No Trespassing” sign “clearly posted on a gate across the only public access to the property” revoked the implicit license because “the message to the public was [not] ambiguous”). But nothing aside from their numerosity makes the “No Trespassing” signs in this case particularly distinctive. And numerosity alone does not eliminate the ambiguity I noted above. No special facts — -like a fence or other physical obstacle — clarified to the reasonable visitor that these signs revoked the license.
Thus, context matters. Is the home on a suburban residential street, like here, or an urban row with a small step to the front door? Or is the property fenced acreage in the Rocky Mountains on prime fishing water ’far from civilization? Would a “No Trespassing” sign really communicate that first..responders, or Girl Scouts, or even officious neighbors were categorically barred from the front porch? Was the sign- coupled with more information that peddlers or the police were particularly unwelcome that might alter the message understood by a reasonable observer? And so on. .
The dissent points to Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), as supporting its view that the placement of the sign in this case revoked the implied license. But I do not think the Breard case meaningfully in *1001 forms our analysis. That case dealt with the constitutionality (under[1] the First Amendment and the Commerce Clause) of a state statute regulating,/the rights of solicitors and peddlers to, go into .private residences. Id. at 624, 71 S.Ct. 920. The dissent correctly notes that the case endorsed, as one method of providing notice of revocation of the implied license to knock, state statutes that allowed for criminal trespass actions if a solicitor entered land posted with “No Trespassing” signs. Id. at 626 n. 2, 71 S.Ct. 920. But we know that state law is not determinative of objective “reasonableness.” For example, in Virginia v. Moore, the Supreme Court found an arrest reasonable despite state law not allowing such an arrest. 558 U.S. 164, 179, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008). The -Court -made clear that the Fourth Amendment does not simply “incorporate” state statutes. Id. (“No early case or commentary, to. our knowledge, suggested the Amendment was intended tp incorporate subsequently enacted statutes,”). Indeed, the Fqurth Amendment's history suggests “if anything, that- founding-era citizens -were skeptical of .using the rules for search and seizure set by- government actors as the index of reasonableness.” Id. The dissent concedes that the common law is not determinative in deciding whether “No Trespassing” signs revoke' the customary license. See Dissent at 1009 n.7. So in asking whether the officers' actions in this case were reasonable, we should look to the particular circumstances before us, and not state statutes that may alow, for trespass actions. Under this analysis, I do not think the officers unreasonably .believed they could enter the curtilage to knock despite the presence of the signs.
I recognize the attractiveness of the dissent’s view that the inquiry begins and ends with the posting of a “No Trespassing” sign. See, e.g., Powell v. State, 120 So.3d 577, 584 (Fla.Dist.Ct.App.2013) (indicating “No Trespassing” signs alone “ef-' fectively negate”' the implicit license). But the general rule is that we consider the revocation of an implicit license under the reasonable - person - standard. And situations undoubtedly exist where the reasonable person would not think a “No Trespassing” sign revoked the license. I think the inquiry, therefore, cannot -be as simple as the dissent suggests. The. result turns on the totality of the circumstances.
In my view, because the implicit license was not revoked, police could approach Chrloss’s door and knock, as “any private citizen might do.” Jardines, 133 S.Ct. at 1416. Subjective ' intent to investigate makes ho difference. We often characterize knock and talks pursuant to the implicit license as “investigations.” See, e.g., United States v. McDowell, 713 F.3d 571, 574 (10th Cir.2013); see also Jardines, 133 S.Ct. at 1424 (Alito, J., dissenting) (noting that the “purpose of discovering information” is the objective of a knock and talk). A desire to .gain information does not make illegitimate., a private citizen’s use of the implicit license to enter the curtilage— indeed, that is the purpose of many such approaches. The same implicit license justifies police knock and talks. See Jardines, 133 S.Ct. at 1416 n. 4.
And, barring its revocation, it justified the knock and talk here. We do not have the situation in Jardines where police used sensory extending drug dogs or hypothetically pould have used their access to study the interior of the targeted house. A mere investigatory purpose will not invalidate an otherwise licensed police entry into the curtilage in every instance. A Fourth Amendment physical-intrusion case poses a twofold question: (1) whether police intruded without license into a constitutionally-protected area) and (2) whether they obtained information via that intrusion. See id. at 1414-15. Subjective intent is *1002 irrelevant. See id. at- 1416 n. 4 (noting that a police “purpose of discovering information” is permissible as long as the intrusion is licensed).[2]
To be sure, the Jardines Court said the question “whether the officer’s conduct was an objectively reasonable search” turned on “whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered.” Id. at 1417. But this accords with the objective framework outlined above. The Court’s point was simple: a reasonable person would think the implicit license, which “typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave,” id. at 1416, does not authorize the public to scour the curtilage for drugs with a drug-sniffing dog, see id. at 1416 (“[introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation' to do that”). Thus, Jardines did turn on why those officers entered the porch, because intending to search with a drug-sniffing dog is irreconcilable with intending to use the implicit license as the general public would. See id. Those officers intended the former. Consequently, although the implicit license remained' intact, it did not shield them. Their conduct was simply beyond its scope.
That is not the case here. These officers entered the curtilage to gain information just as any private citizen would — by speaking with the owner, not by searching with a drug dog. Their “purpose of discovering information” did not cause that entry to violate the Fourth Amendment, as long as the entry was “permitted conduct” — that is, as long as the implicit license had not been revoked. See id. at 1416 n. 4. Our case thus hinges entirely on the revocation question. And that question, as I have explained, turns on an objective application of the reasonable person standard.
Consequently, as long as an officer really is using the implicit license, his intent is irrelevant. The Jardines Court’s repeated .statement of the governing rule without any reference to officer intent makes this clear. See id. at 1414 (noting that a “search within the original meaning of the Fourth Amendment” has occurred when “the Government obtains information by physically intruding on” constitutionally protected areas) (internal quotation marks omitted); id. at 1415 (noting that, because the investigation “took place in a constitutionally protected area” the relevant question-was “whether it was accomplished through an unlicensed physical intrusion”); id. (noting that, where the investigation takes place in a protected area, the “only question is whether [the occupant has] given his leave (even implicitly) for [the police to enter]”).
One final point: police ability to enter the curtilage is not untrammeled; if a homeowner revokes the license-with sufficient clarity, police can no longer avail themselves - of the implicit license. Of course, police can always enter a home if an emergency or other exigent circumstance has provided sufficient justification to enter. But where no such circum *1003 stances exist, police entry into the curti-lage turns on the implicit license.

. For example, trespass in Oklahoma is the "willful[] or maliciousC]” entry of the property "of another after being expressly forbidden to do so or without permission of the owner ... when such property is posted.” Okla. Stat. tit. 21, § 1835.a. A reasonable observer might well take a "No Trespassing” sign simply to reiterate that he could not enter the property if he was forbidden to do so, not that it actually forbade him to enter.

. This case’s focus on Fourth Amendment physical-intrusion doctrine does not suggest that the reasonable-expectation test rooted in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is not still good law. See Jardines, 133 S.Ct. at 1417 (“The Katz reasonable-expectations test has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment,..,”) (internal quotation marks omitted). The two exist simultaneously; Katz is simply not implicated here.