**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 46217**

| | | |
|---|---|---|
| **IDAHO DEPARTMENT OF**<br>**ENVIRONMENTAL QUALITY,** | ) ) ) | |
| Plaintiff-Respondent, | ) ) | **Boise, December 2019 Term** |
| v. | ) ) | **Opinion Filed: March 11, 2020** |
| **DAVID R. GIBSON, dba BLACK**<br>**DIAMOND COMPOST PRODUCTS, and**<br>**VHS PROPERTIES, LLC,** | ) ) ) | **Karel A. Lehrman, Clerk** |
| Defendants-Appellants. | ) ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Jonathan Medema, District Judge.

The judgment of the district court is affirmed.

Vernon K. Smith Law Office, Boise, for Appellants. Vernon K. Smith argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Mark Cecchini-Beaver argued.

_____

BURDICK, Chief Justice.

The Department of Environmental Quality ("DEQ") brought a civil enforcement action under the Environmental Protection and Health Act against David Gibson and VHS Properties, LLC, ("VHS"), for illegally operating a composting facility. After a three-day bench trial, the district court determined that Gibson was operating a "Tier II Solid Waste Processing Facility" without prior approval from DEQ. The district court assessed a civil penalty and issued an injunction. On appeal, Gibson raises numerous issues regarding DEQ's authority to regulate compost and its inspection of the property. DEQ responds and argues that Gibson's appeal is partially time-barred. We hold that although Gibson's appeal is not time-barred, he has failed to show error. We affirm the judgment of the district court.

1

# I.    FACTUAL AND PROCEDURAL BACKGROUND

On "largely bare desert" land southwest of the Boise Airport, in a roughly ten-acre lot enclosed by a three-foot-high barbed-wire fence, several large windrows jut from the earth. Comprised of grass clippings, straw, leaves, stale hay and dirt, these long lines of materials are the work of David Gibson, the owner and operator of Black Diamond Composting.

The facility has operated at this location, on property owned by VHS, since 2010. It features an "Open 24-7" sign asking all "lawn care professionals" to sign in with their name and information. A second sign details the fees[1] per load deposited ($5 per load, $100 per load if the depositor fails to sign in, and $1,000 if the deposit contains branches). Arrows painted on 55-gallon metal drums direct traffic into the facility. Gibson's operation depends on landscapers, lawn-care professionals, farmers, and municipal agencies to deliver grass clippings, leaves, stale hay, and straw. Some deposits are made on an *ad hoc* basis, but others are more routine. Boise City and the Ada County Highway District, for instance, paid Gibson a modest fee in order to deposit leaves and grass clippings from their seasonal maintenance activities. Gibson combines the materials with dirt by turning the piles into windrows to assist the decomposition process.

On March 28, 2013, DEQ was alerted to possible odor issues concerning Black Diamond Composting while investigating a different company. After conducting some preliminary research, DEQ employees Dean Ehlert and Jack Gantz drove to the site, parked outside the fence, followed the signs in, and observed the facility. Unable to locate anyone, Ehlert and Gantz left the property. A few months later, in July 2013, DEQ notified Gibson that, based on its research and observations, he was in apparent violation of DEQ's Solid Waste Management Rules. In response, Gibson asserted that his facility was not subject to regulation by DEQ or its Solid Waste Management Rules.

In March 2015, DEQ filed a complaint against Gibson and VHS under the Environmental Protection and Health Act ("EPHA"). It alleged that Gibson, as the operator of the composting facility, and VHS Properties, as the owner of the property, were in violation of DEQ's Solid Waste Management Rules found at IDAPA 58.01.06.012.02. Specifically, DEQ alleged that Gibson was operating a "Tier II" solid-waste processing plant and had failed to: provide documentation demonstrating compliance with siting requirements; submit an operating plan; or

---

[1] Gibson maintained the fees were "donations" at trial.

obtain approval for the site or operating plan. DEQ sought relief in the form of a permanent injunction that would require Gibson to submit an application and plan, and then comply with the plan once approved. It also requested statutory penalties and attorney's fees and costs under Idaho Code sections 12-117 and 12-121.

In answer, Gibson asserted numerous affirmative defenses. Those relevant to this appeal included: DEQ's Solid Waste Management Rules exclude "plant or crop residue" from its definition of solid waste; the facility is regulated by the Department of Agriculture, thereby triggering another exception to the definition of solid waste; and DEQ's regulatory scheme is preempted by Idaho's Right to Farm Act or the Soil and Plant Amendment Act.

DEQ filed a motion for summary judgment on all claims, including Gibson's affirmative defenses. Gibson opposed the motion and argued for the first time that the statute of limitations prohibited DEQ from bringing the action. The district court granted DEQ's motion for summary judgment in part, ruling that regulation of compost does not fall under the authority of the Idaho Department of Agriculture and that DEQ's Solid Waste Management Rules are not precluded by the Idaho Right to Farm Act or the Soil and Plant Amendment Act. However, the district court denied DEQ's motion in part, finding that a genuine issue of material fact remained as to the source of the materials. This, the court reasoned, would determine whether there was merit to Gibson's defense that his facility fell under the Solid Waste Management Rules' exception for "crop (plant) residue ultimately returned to the soil at agronomic rates."

Gibson then filed a motion to dismiss, again raising the statute of limitations under Idaho Code section 39-108(4). The district court denied the motion, ruling that it was an improperly filed motion for summary judgment and was untimely under both Rule 56(b)(1) and the court's scheduling order. Gibson then moved to amend his answer to include the statute of limitations defense. Gibson raised this defense again the day before trial in his "Pre-Trial Memorandum to Support Motion for Directed Verdict," but, this time, asserted that Idaho Code section 39-108(4) was a statute of repose.

The district court focused the trial issues on whether the grass clippings and leaves were "discarded material" subject to DEQ regulation as "solid waste"; whether composting is "processing solid waste" under the Act; and whether Gibson's operation processed solid waste in excess of 600 cubic yards, triggering "Tier II" status. A three-day court trial took place in September 2017.

3

At trial, while cross-examining Dean Ehlert, Gibson's counsel moved to strike all the testimony Ehlert had offered concerning his initial visit to Black Diamond Composting. Gibson's counsel argued that Ehlert's testimony should be excluded because DEQ's initial investigation amounted to an unconstitutional search. The district court denied the motion, but, at the close of trial, requested briefing on the issue. Thereafter, the district court again denied the motion to strike, ruling Ehlert's initial investigation did not amount to a "search" implicating constitutional protections.

On March 1, 2018, the district court entered its Findings of Facts and Conclusion of Law. The court concluded that Gibson was operating a Tier II solid waste processing facility without having complied with the application and siting requirements of the Solid Waste Management Rules. The district court determined that the grass clipping and leaves constituted "solid waste" under the Solid Waste Management Rules and the Environmental Protection and Health Act, and that DEQ had proved that more than 600 cubic yards of such material had been brought to and processed at Gibson's facilities in 2013 and 2014. However, the district court determined that compost and humus products were not solid waste under the EPHA. Given this conclusion, the district court reasoned that it could not determine the amount of solid waste processed at Gibson's facilities in other years because the grass clippings and leaves eventually transformed into humus or compost. Lastly, the court also ruled that Idaho Code section 39-108(4) was not a statute of repose and did not bar DEQ's suit.

The district court entered a final judgment assessing penalties against Gibson and VHS in the amount of $1,000 and $250, respectively. Additionally, the district court awarded DEQ $3,466.53 in expenses to be paid, jointly and severally, by the defendants, and also issued an injunction that required Gibson to comply with the Solid Waste Management Rules commensurate with the amount of solid waste he would receive.

Twelve days after the district court entered its findings and conclusions, Gibson filed a "motion for reconsideration" citing Rule 11 of the Idaho Rules of Civil Procedure. The district court construed the motion as a Rule 52(b) motion to amend the court's findings and conclusions, and summarily denied it. Gibson appealed, and DEQ moved this Court to dismiss the appeal as untimely, arguing that Gibson's "motion for reconsideration" was insufficient to toll the time period to timely file an appeal under Idaho Appellate Rule 14. This Court denied the motion without prejudice.

4

## II.    ISSUES ON APPEAL

1.  Did Gibson's mistitled "motion for reconsideration" fail to toll the period for a timely appeal under Idaho Appellate Rule 14?

2.  Did Gibson waive his arguments under the Idaho Solid Waste Facilities Act, the Resource Conservation and Recovery Act, federal regulations, and Idaho Code section 39-108(4) by failing to properly raise them below?

3.  Did the district court err in denying Gibson's motion to strike by finding no Fourth Amendment search took place?

4.  Does substantial and competent evidence support the district court's factual findings that Gibson's facility was processing sufficient amounts of solid waste to qualify as a Tier II solid waste processing facility?

5.  Did the district court properly conclude that grass clipping and leaves were "solid waste" under the Environmental Protection and Health Act and subject to the Solid Waste Management Rules?

6.  Did the district court err in awarding injunctive relief, DEQ's expenses, and monetary penalties against Gibson?

7.  Is either party entitled to attorney's fees on appeal?

## III.    STANDARD OF REVIEW

The review of a trial court's decision after a court trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. This Court will affirm a trial court's findings of fact unless those findings are clearly erroneous. Findings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record. Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion. Finally, because of the trial court's special role to weigh conflicting evidence and judge the credibility of witnesses, this Court will liberally construe the trial court's findings of fact in favor of the judgment entered.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citations and internal quotation marks omitted); *see also* I.R.C.P. 52(a)(7). "In a motion to amend findings of fact, the decision of the trial court denying the motion will not be disturbed on appeal where the court's findings are supported by competent and substantial evidence." *Johnson v. Edwards*, 113 Idaho 660, 662, 747 P.2d 69, 71 (1987) (citing I.R.C.P. 52(a)).

This Court reviews questions of law, such as interpreting statutes and addressing questions of federal preemption, de novo. *Idaho Dep't of Health & Welfare v. McCormick*, 153 Idaho 468, 470, 283 P.3d 785, 787 (2012). This Court also "exercise[s] free review over

5

questions regarding the application of procedural rules." *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012).

Decisions regarding the admission of evidence are reviewed for an abuse of discretion. *Karlson v. Harris*, 140 Idaho 561, 564, 97 P.3d 428, 431 (2004) (citation omitted). We review discretionary decisions under the familiar four-part standard, asking whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

## IV.    ANALYSIS

Before reaching the issues raised, we note that the appellate record in this case is woefully inadequate. Specifically, the trial transcript is both fragmented and incomplete. "The party appealing a decision of the district court bears the burden of ensuring that this Court is provided a sufficient record for review of the district court's decision." *Gibson v. Ada Cty.*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003) (citations omitted). Recognizing that burden, this Court presumes that the absent portion of the record supports the district court's ruling. *Id.* To be clear, "we will not presume error from a 'silent record or from the lack of a record.'" *Id.* (quoting *Brooks v. Brooks*, 119 Idaho 275, 280, 805 P.2d 481, 486 (Ct. App. 1990)). Here, the record contains a certified transcript of an Ada County Highway Department employee's trial testimony from September 15, 2017, but the other two days of trial testimony exist only in the partial excerpts attached to two of DEQ's motions below. Therefore, there is no complete, certified transcript to aid our assessment of the issues on appeal and we will note that absence when pertinent.

**A. Gibson's appeal is not time barred because the district court had jurisdiction to hear his unsuccessful Rule 52(b) Motion. Thus, his motion was sufficient to toll the time in which he could file an appeal under Idaho Appellate Rule 14(a).**

On appeal, DEQ urges this Court to determine that Gibson's appeal is partially time barred under this Court's decision in *First Bank & Trust of Idaho v. Parker Bros., Inc.*, due to his failure to specify valid grounds for his "motion for reconsideration." 112 Idaho 30, 32, 730 P.2d 950, 952 (1986). DEQ contends that this failure left the district court without jurisdiction to entertain the motion, which leaves this Court without jurisdiction to hear Gibson's appeal. Gibson counters that his motion, though mistitled and citing the incorrect rule, was substantively

based upon his request to amend or alter the findings, conclusions, and judgment. Therefore, in Gibson's view, the district court properly reviewed and ruled on the motion under Rule 52(b) and 52(e) and, therefore, the motion meets the requirements to toll the filing period under Idaho Appellate Rule 14(a).

Typically, appeals from the district court must be made within 42 days of the entry of the appealable order or judgment. I.A.R. 14. Failure to observe this timing requirement renders the court without jurisdiction to hear the appeal. I.A.R. 21. However, this requirement is tolled by the filing of a motion that "if granted, could affect any findings of fact, conclusions of law or any judgment in the action." I.A.R. 14(a). Both a motion for reconsideration under Idaho Rule of Civil Procedure 11.2(b) and a motion to amend findings of fact or conclusions of law under Rule 52(b) fall under this category. Both motions must be made within 14 days of entry of the final judgment. *See* I.R.C.P. 11.2(b)(1), 52(b).

Here, the district court entered its findings of fact, conclusions of law, and final judgment on March 1, 2018. Twelve days later, on March 13, 2018, Gibson filed a "Motion for Reconsideration of Findings of Fact, Conclusions of Law, and Judgment entered March 1, 2018," requesting that the district court "reconsider" its findings, conclusions, and judgment pursuant to Rule 11(a)(2)(B) of the Idaho Rules of Civil Procedure (an outdated rule citation). In a response to DEQ's memorandum in opposition, Gibson cited Rule 11.2(b) (the current version of this rule), but also stated that his request was "not inconsistent with what could be a Rule 52(b) Motion." He also attached an affidavit, to which DEQ objected at the hearing. A day later, Gibson filed an additional memorandum reiterating his belief that his original motion should be reviewed "substance over form" as a motion for reconsideration, but argued that his motion could be construed under Rule 52(b). Ultimately denying Gibson's motion, the district court construed the motion under Rule 52(b) by noting that Rule 11.2(b) "does not provide a mechanism for seeking reconsideration of a final judgment." As a consequence, the court sustained DEQ's objection to the affidavit, reasoning that new evidence cannot be considered on a Rule 52(b) motion.

We find no error in the district court's decision to construe the motion under Rule 52(b) for two reasons. First, that rule was the procedurally proper mechanism for Gibson's request. Rule 52(b) provides:

On a party's motion filed no later than 14 days after the entry of judgment, the court may amend its findings, or make additional findings, and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

Rule 11.2(b), on the other hand, reads:

Motion for Reconsideration.

(1) In general. A motion to reconsider any order of the trial court entered before final judgment may be made at any time prior to or within 14 days after the entry of a final judgment. A motion to reconsider an order entered after the entry of final judgment must be made within 14 days after entry of the order.

(2) Certain orders not subject to reconsideration. No motion to reconsider an order of the trial court entered on any motion filed under Rules 50(a), 52(b), 55(c), 59(a), 59(e), 59.1, 60(a), or 60(b) may be made.

Because Gibson sought modification of the district court's judgment and its findings and conclusions following a bench trial, he should have identified Rule 52(b) as the specific rule applicable to the circumstances. *See Turcott v. Estate of Bates*, 165 Idaho 183, 188, 443 P.3d 197, 202 (2019).

Second, though DEQ asserts that the district court erred by characterizing Gibson's motion as a Rule 52(b) motion because it was facially deficient under Idaho Rule of Civil Procedure 7, we determine that the district court acted within its discretion. Rule 7 provides that motions must

(A) be in writing unless made during a hearing or trial;

(B) state with particularity the grounds for the relief sought including the number of the applicable civil rule, if any; [and]

(C) state the relief sought;

I.R.C.P. 7(b). While the rule carries the mandatory "must" language, "[w]hether to strictly enforce the motion requirement seems to be a matter within the court's discretion." F.R.C.P. 7, Rules and Commentary (commenting on the nearly identical federal analog); *see also Franklin Bldg. Supply Co. v. Hymas*, 157 Idaho 632, 640, 339 P.3d 357, 365 (2014) (noting that lower courts have discretion under Rule 7(b)(1) to ignore new arguments raised in reply memorandum). So while there "is ample authority for a court to ignore or reject requests that are not properly made[,]" the purpose of the state-grounds-with-particularity requirement is to provide the opposing party with notice. F.R.C.P. 7, Rules and Commentary. Courts "generally

8

apply a reasonableness test to determine whether the motion was particular enough" to provide adequate notice. *Id*.

Here, the district court elected to treat Gibson's ill-drafted motion under the procedurally proper Rule 52(b). DEQ had adequate notice of Gibson's claim because the motion sought modification of the district court's findings, conclusions, and final judgment, even though it failed to abide by the letter of the rule. While DEQ did not specifically oppose the motion as a Rule 52(b) motion, it did argue that the district court should not consider new evidence or new argument and that the findings, conclusion, and judgment should not be altered. The district court denied Gibson's motion under Rule 52(b) and declined to consider the affidavit, so DEQ's objection was successful. Accordingly, we determine that the district court did not abuse its discretion by construing the motion under Rule 52 instead of simply rejecting it. Thus, it properly rejected the new evidence and we will not consider that evidence on appeal. *See PHH Mortg. Servs. Corp. v. Perreira*, 146 Idaho 631, 635, 200 P.3d 1180, 1184 (2009).

Once properly construed, Gibson's motion was sufficient to toll the window to appeal. That said, when a motion for reconsideration is improperly *and* untimely filed, it will not serve to toll the time to appeal. *Shelton v. Shelton*, 148 Idaho 560, 564, 225 P.3d 693, 697 (2009). Here, Gibson's motion properly invoked the jurisdiction of the court because his motion, once properly construed, was timely filed under the proper rule. True, parties cannot cure the failure to timely file the proper motion by advancing the motion under the cloak of a separate rule with a different timing requirement. However, Gibson filed his motion 12 days after the final judgment, making it timely under Rule 52(b). Thus, the district court had jurisdiction to enter its order denying the motion and there is no jurisdictional defect to Gibson's issues on appeal. Idaho Appellate Rule 14 does not require a successful motion, simply one that, if granted, would alter the findings and conclusions or final judgment.

Lastly, DEQ argues that *First Bank & Trust of Idaho v. Parker Bros., Inc.*, 112 Idaho 30, 32, 730 P.2d 950, 952 (1986) supports its position regarding this Court's lack of jurisdiction to hear the appeal. DEQ is incorrect, because *First Bank* was decided before this Court had promulgated a rule to allow motions for reconsideration to be filed. Thus, *First Bank* has no application in the facts before us. The district court decided to construe an improperly denominated motion for reconsideration as a motion under Rule 52(b). The court had the

9

discretion to do so, as we have noted above, and particularly in light of Rule 1(b)'s admonition to construe the rules "to secure the just . . . determination of every action." I.R.C.P. 1(b).

To sum up, we have jurisdiction to hear Gibson's issues on appeal because his notice of appeal was timely filed.

## B. Legal Background

Before reaching Gibson's issues on the merits, it is worth setting out the applicable law to provide context for his arguments.

The Idaho Department of Environmental Quality is a regulatory agency created by the Idaho Environmental Protection and Health Act ("EPHA"). I.C. §§ 39-101 to -175F. In 1972, the Idaho Legislature tasked DEQ's predecessor with formulating and approving rules and regulations regarding "solid waste disposal." 1972 Sess. Laws 1017–18; 1018–26. Specifically, subsection 5.3.m provided DEQ with the "supervision and administration of a statewide solid waste disposal plan including the enforcement of rules and regulations for minimum sanitary standards for the storage, collection, incineration, *composting*, grinding, disposing or other processing of *solid wastes . . .*" *Id.* at 1022 (emphasis added).

In 1976, Congress passed the Resource Conservation and Recovery Act ("RCRA") to create a national framework for the proper management of hazardous and non-hazardous solid waste. 42 U.S.C. § 6901; *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). The RCRA employs a bifurcated approach to solid waste, with one subtitle dealing with "hazardous waste" (Subtitle C, 42 U.S.C. §§ 6921–6939e), while the other subtitle only deals with "nonhazardous waste" (Subtitle D, 2 U.S.C. §§ 6941–6949a). *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 332 (1994). Whereas Subtitle C regulates hazardous waste "from cradle to grave, in accordance with . . . rigorous safeguards and waste management procedures," the RCRA regulates nonhazardous wastes "much more loosely under Subtitle D." *Id.* at 331. "Unlike Subtitle C, Subtitle D was to be largely state-administered upon the Agency's approval of the state's solid waste management plan." *Sierra Club v. U.S. E.P.A.*, 992 F.2d 337, 339 (D.C. Cir. 1993); *see also Envtl. Def. Fund v. E.P.A.*, 852 F.2d 1309, 1310 (D.C. Cir. 1988); 42 U.S.C. § 6941.

In 1979, the Environmental Protection Agency ("EPA") issued basic criteria for Subtitle D sanitary landfills and guidelines for the approval of state Subtitle D waste-management plans. *See* 40 C.F.R. 256 and 257. Those regulations ban the open dumping of waste and set out regulatory baselines—such as designs, locations, financial assurances, clean-up assurances, and

closure requirements for the operation of municipal and industrial waste landfills. 40 CFR 239 to 258.

In 1984, in response to concerns that these criteria did not adequately address the problem of hazardous material appearing in municipal solid waste, Congress added section 4010 to the RCRA requiring the EPA to revise the Subtitle D criteria to better address household hazardous waste and generators of small quantities of hazardous wastes. 42 U.S.C. § 6949a(c). In 1991, the EPA promulgated specific criteria for municipal solid waste landfills. 56 Fed Reg. 50, 978 (1991). These requirements were much more stringent than non-municipal solid waste landfills, reflecting the EPA's view that municipal solid waste facilities posed the largest threat. Jeffrey M. Gaba & Donald Stever, *Law of Solid Waste, Pollution Prevention and Recycling* § 1:10, 4:7–4:18 (Supp. 2019); *cf.* 40 CFR 258.

In 1992, the Idaho Legislature enacted the Idaho Solid Waste Facilities Act ("ISWFA"). 1992 Idaho Sess. Laws 973. ISWFA was enacted to, in part, establish "solid waste disposal standards and procedures . . . and a facility approval process for the state of Idaho, the political subdivisions thereof, and any private solid waste disposal site owner[.]" 1992 Idaho Sess. Laws 973. Likewise, ISWFA's function was to bring Idaho into compliance with subtitle D of the RCRA. I.C. § 39-7404. ("The legislature intends that the state of Idaho enact and carry out a solid waste program that will enable the state to achieve approved state status with respect to solid waste disposal facility regulation from the federal government."). ISWFA "appl[ies] to owners and operators of new municipal solid waste landfill (MSWLF) units, existing MSWLF units, and lateral expansions of existing MSWLF units, except as otherwise specifically provided." I.C. § 39-7402(1). In addition to DEQ's preexisting power to promulgate rules and regulations regarding solid waste, the 1992 legislation granted DEQ the authority to supervise and administer "a statewide solid waste disposal plan." *Id.* Specifically, the 1992 legislation vested DEQ with the authority to "develop and propose regulations" necessary to "supplement details of compliance" with the RCRA or ISWFA. 1992 Sess. Laws 331.

DEQ still holds these two grants of regulatory authority. DEQ has its broad grant of authority to promulgate "rules as may be necessary to deal with problems related to . . . *solid waste disposal* . . . ." I.C. § 39-105(2) (emphasis added). "Solid Waste Disposal" is defined as: "the collection, storage, treatment, utilization, *processing* or final disposal of *solid waste*." I.C. § 39-103(14) (emphasis added). DEQ is also entrusted with "administration of solid waste

11

disposal site and design review in accordance with [the Idaho Solid Waste Facilities Act] and [the statutes governing public health districts]." I.C. § 39-105(3)(g). Under that section, the director maintains the authority to develop rules to supplement compliance with the Idaho Solid Waste Facilities Act so long as those rules do not "conflict with the provisions of [the EPHA]" or become "more strict than the requirements established in federal law or in the solid waste facilities act." I.C. § 39-105(3)(g)(v).

## C. Gibson did not waive his arguments under the ISWFA, RCRA, and federal regulations, but waived the defense of federal preemption.

DEQ argues that Gibson waived all defenses under the Idaho Solid Waste Facilities Act, the Resource Conservation and Recovery Act, and federal regulations as they related to federal preemption by failing to properly raise his preemption defense. Specifically, DEQ claims that Gibson first raised the ISWFA, RCRA, and/or federal regulations in a "Supplemental Reply to DEQ's Closing Arguments" which the district court declined to consider, and then again in his motion for reconsideration that the district court summarily denied. As such, DEQ contends it lacked an adequate opportunity to respond. In response, Gibson claims that he argued each basis and secured an adverse ruling in the district court's ruling on his motion for reconsideration. He contends that citation to the applicable law is not an affirmative defense, and points to *ACHD v. Brook View, Inc.*, 162 Idaho 138, 395 P.3d 357 (2017) to argue that his citation to this authority was part of an "evolving" argument that threaded through his "Reply Closing Argument," "Supplemental Closing Argument," and "Motion for Reconsideration of the Findings, Conclusions, and Judgment."

Gibson's preemption arguments rely both on the RCRA and the EPA regulations to argue that DEQ's interpretation of "solid waste" is impermissible. This argument relies both on general federal preemption principles and the provision of the ISWFA which prohibits DEQ from "promulgat[ing] any rule pursuant to this act that would impose conditions or requirements more stringent or broader in scope than the referenced RCRA regulations." I.C. § 39-7404.

To the extent that Gibson references the federal statutes, regulations, and cases as a means of asserting federal preemption over Idaho's statutes and regulatory schemes, he lost the opportunity to pursue the argument on appeal by failing to timely assert federal preemption as an affirmative defense. The United States Supreme Court has interpreted the Supremacy Clause to mandate that federal law "shall be the supreme Law of the Land," and that state law which conflicts with federal law is "without effect." *Idaho Dep't Of Health & Welfare v. McCormick*,

12

153 Idaho 468, 471, 283 P.3d 785, 788 (2012) (citing U.S. Const. art IV, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). Federal preemption is typically considered an affirmative defense. *See* Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1271 (3d ed.) (listing cases); *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998) (commenting that "federal preemption is ordinarily a defense."); *see also Carey v. Gatehouse Media Massachusetts I, Inc.*, 94 N.E.3d 420, 429 (2018) ("[W]here a Federal statute achieves its preemptive effect not by depriving State courts of subject matter jurisdiction, but instead by altering the law that such courts must apply, preemption is a waivable affirmative defense.").

Idaho Rule of Civil Procedure 8(c) requires a party to affirmatively state "any avoidance or affirmative defense . . ." The Rule exists to "alert the parties to the issues of fact which will be tried and to afford them an opportunity to present evidence to meet those defenses." *Kenworth Sales Co. v. Skinner Trucking, Inc.*, 165 Idaho 938, 943, 454 P.3d 580, 585 (2019) (citing *Williams v. Paxton*, 98 Idaho 155, 164, 559 P.2d 1123, 1132 (1976)). While federal preemption is not on the list found in Rule 8(c), that list is not exhaustive. *Id.* Affirmative defenses, if not properly raised, may be waived. *Krinitt v. Idaho Dep't of Fish & Game*, 162 Idaho 425, 429, 398 P.3d 158, 162 (2017). *But see Williams v. Paxton*, 98 Idaho 155, 164 n.1, 559 P.2d 1123, 1132 n.1 (1976) (holding a party did not waive asserting the unconstitutionality of a statute because it is "not ordinarily an issue upon which evidence must be presented at trial" or "about which [the plaintiff] must be forewarned in order to prepare evidence for trial."). Here, Gibson's federal preemption argument requires notice and an opportunity to respond by DEQ. Thus, the argument is an affirmative defense. Gibson did not raise these arguments until post-trial briefing, and therefore, Gibson has waived that affirmative defense by not raising it before trial.

However, Gibson has preserved his arguments that rely upon this same legal authority to suggest that compost is not solid waste subject to DEQ regulation. Gibson's argument that DEQ lacks authority under federal law draws upon similarities between the statutes. To the extent he argues that compost is not "solid waste," and that federal court's interpretation of the RCRA supports that reading, he has preserved this argument. The district court conducted this analysis in its decision on DEQ's motion for summary judgment, and DEQ raised these same arguments in its pre-trial memorandum. In *Ada County Highway District v. Brookview*, this Court held it was appropriate for a party to bolster its claim with additional statutory resources so long as the position before the court was the same. *Ada Cty. Highway Dist. v. Brooke View, Inc.*, 162 Idaho

138, 142 n. 2, 395 P.3d 357, 361 n. 2 (2017). Here, Gibson's ultimate position—that DEQ is without regulatory authority to regulate his compost operations as "solid waste"—is the same, but he is supplementing it with federal authority that has addressed a similar provision under the RCRA.

To the extent Gibson argues that Idaho Solid Waste Facilities Act requires DEQ to defer to the EPA's interpretation of "solid waste" in its federal regulations, his argument is not a question of federal preemption, but of interpreting Idaho statutory law. That is, if the Idaho Legislature determined that DEQ could go no further than federal law, then Idaho Code section 39-7404 would be the source for striking down the allegedly improper regulation, not the Supremacy Clause. Thus, the question is appropriately before us on appeal.

This argument is ultimately unpersuasive on the merits because the Idaho Solid Waste Facilities Act does not apply here. The ISWFA was intended to satisfy the EPA regulations concerning municipal solid waste landfills. *See* I.C. § 39-7401(2) ("Therefore, it is the intent of the legislature to establish a program of solid waste management which complies with 40 CFR 258 and facilitates the incorporation of flexible standards in facility design and operation."); 40 CFR 258 (criteria for municipal solid waste landfills). By its terms, it applies "to owners and operators of new municipal solid waste landfill (MSWLF) units [and] existing MSWLF units . . . ." I.C. § 39-7402. A MSWLF is defined as "a discrete area of land or an excavation that receives household waste, and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined under 40 CFR 257.2." I.C. § 39-7403(31). A MSWLF unit also may receive other types of RCRA subtitle D wastes, such as commercial solid waste, nonhazardous sludge, conditionally exempt small quantity generator waste and industrial solid waste. *Id.* Such a landfill may be publicly or privately owned. *Id.* A MSWLF unit may be a new MSWLF unit, an existing MSWLF unit or a lateral expansion. *Id.*

The Solid Waste Management Rules being enforced against Gibson are not those that govern a municipal solid waste landfill. The record is devoid of any allegations or facts that Gibson's facility receives household waste as defined above. Therefore, his solid waste facility is regulated as a non-municipal solid waste facility under DEQ's Solid Waste Management Rules. These rules were promulgated pursuant to DEQ's broad rulemaking authority concerning solid waste under Idaho Code section 39-105(2). As a consequence, the limits that Idaho Code section 39-105(3)(g)(v) places on DEQ's rulemaking authority under the ISWFA are not implicated.

14

**D. Idaho Code section 39-108(4) is not a statute of repose.**

On appeal, Gibson argues that Idaho Code section 39-108(4) is a statute of repose and acts as a time bar to DEQ's action against him. DEQ argues that Gibson failed to preserve this issue for appeal because he consistently argued that Idaho Code section 39-108(4) was a statute of limitations and changed his positions in a standalone memorandum submitted on the eve of trial. Gibson argues that he preserved this issue by receiving an adverse ruling. Gibson also claims that no surprise or prejudice affected DEQ because he raised Idaho Code section 39-108(4) "long before trial and during summary proceedings." We determine that Gibson adequately preserved this issue for review but agree with the district court that section 39-108(4) is not a statute of repose.

Gibson first raised section 39-108(4) as a statute-of-limitations argument in his memorandum in opposition to DEQ's motion for summary judgment. Gibson renewed his statute-of-limitations argument in an untimely motion to dismiss. Around a month before trial, Gibson moved to amend his answer to include the statute-of-limitations defense. DEQ opposed, arguing it was untimely and that Gibson had waived this defense. It is unclear from the record whether this motion was ever ruled upon. However, the day before trial, Gibson raised section 39-108(4) as a statute of repose in his pre-trial memorandum, then again in his written closing argument, and then again in a memorandum in support of his motion to strike. Despite Gibson's eleventh-hour challenge, the district court addressed the argument in its findings and conclusions, ruling that Idaho Code section 39-108(4) was not a statute of repose.

Though the Idaho Rules of Civil Procedure require statue-of-limitations defenses to be specially pled, *see* I.R.C.P. 9(h) ("In pleading the statute of limitations it is sufficient to state generally that the action is barred, and the applicable statute or Session Law relied upon must be pled with particularity."), we have allowed an unpleaded affirmative defense to be raised before trial. For instance, "[t]his Court has held that an affirmative defense may be raised for the first time on a motion for summary judgment." *Fuhriman v. State, Dep't of Transp.*, 143 Idaho 800, 804, 153 P.3d 480, 484 (2007). "The issue then becomes whether the defense was raised before trial and whether the defendant was given time to argue in opposition to the defense." *Id.* Despite Gibson raising his new statute-of-repose argument on the eve of trial, the district court elected to rule on it. Thus, Gibson obtained an adverse ruling. *See Johnson v. Crossett*, 163 Idaho 200, 207, 408 P.3d 1272, 1279 (2018) ("Even if an issue was argued to a lower court, to preserve an issue

for appeal there must be a ruling by the lower court.") (citation and internal punctuation omitted). We will thus address this question on appeal.

However, Gibson's argument lacks merit. Idaho Code section 39-108(4) provides as follows:

> No civil or administrative proceeding may be brought to recover for a violation of any provision of this chapter or a violation of any rule, permit or order issued or promulgated pursuant to this chapter more than two (2) years after the director had knowledge or ought reasonably to have had knowledge of the violation.

Section 39-108(4) is not a statute of repose because it provides that the director's ability to bring a civil or administrative proceeding depends upon when the director ought to have discovered the violation. *See Petrus Family Tr. Dated May 1, 1991 v. Kirk*, 163 Idaho 490, 494, 415 P.3d 358, 362 (2018).

While the usage of the terms "statute of limitations" and "statute of repose" can sometimes become muddled, they represent two distinct types of limitations to bringing a suit. In *Petrus Family Tr. Dated May 1, 1991 v. Kirk*, this Court dealt with Idaho Code section 5-241. 163 Idaho 490, 494, 415 P.3d 358, 362 (2018). That statute limited contract and tort actions stemming from the construction of an improvement on real property by providing that the applicable time period would begin to run as of the date of the structure's completion. *Id.* This Court determined that Idaho Code section 5-241 is a statute of repose because "its operation does not depend on the occurrence or discovery of injury." *Id.* In reaching this conclusion, the Court favorably cited *Corpus Juris Secundum*, which explains that "[a] statute of limitations governs the time within which an action must be commenced after the cause of action accrues, whereas a statute of repose limits the time within which an action may be brought which is not related to the accrual of any cause of action." 54 C.J.S. Limitations of Actions § 7.

Thus, statutes of limitation create "a time limit for suing in a civil case, based on the date when the claim accrued[,]" *e.g.,* a claim accrues in a personal-injury or property-damage action "when the injury occurred or was discovered." *CTS Corp. v. Waldburger*, 573 U.S. 1, 7–8 (2014) (citing Black's Law Dictionary 1546 (9th ed. 2009)). Conversely, a statute of repose "puts an outer limit on the right to bring a civil action" which is "measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *Id.* at 8. In other words, "the period specified in a statute of repose begins when a specific event

16

occurs, regardless of whether a cause of action has accrued or whether any injury has resulted."

54 C.J.S. Limitations of Actions § 7.

> Such limiting statutes serve distinct purposes:
>
> Statutes of limitations require plaintiffs to pursue diligent prosecution of known claims. Statutes of limitations promote justice by preventing surprises through plaintiffs' revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. Statutes of repose also encourage plaintiffs to bring actions in a timely manner, and for many of the same reasons. But the rationale has a different emphasis. Statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time. Like a discharge in bankruptcy, a statute of repose can be said to provide a fresh start or freedom from liability.

*CTS Corp.*, 573 U.S. at 8 (internal citations and quotation marks omitted).

Idaho Code section 39-108(4) does not depend upon the date of the last culpable act of the defendant. Rather, the clock begins to tick upon the director's discovery of the violation. Thus, we find no error in the district court's decision determining that Idaho Code section 39-108(4) is not a statute of repose.

**E. The district court did not err in denying Gibson's motion to strike the testimony of Dean Ehlert.**

    a. Gibson failed to preserve his argument that DEQ lacked sufficient information to start an investigation.

Gibson makes an argument to the effect that DEQ was without adequate information to conduct an inspection. In response, DEQ argues that Gibson raises this issue for the first time on appeal. DEQ asserts that it inspected the facility due to an odor complaint, which is "information concerning an alleged violation" for purposes of Idaho Code section 39-108(1). DEQ argues that failure of a facility to control malodorous gases triggers a mandatory investigation but that the Director also has discretion to order investigations.

Below, Gibson raised some variation of this argument in his memorandum to strike testimony. There, he focused on the lack of a formal complaint or any written report memorializing the investigation. However, this appeared to be more of a narrative flourish to the ultimate thrust of the motion—that Ehlert's investigation was illegally conducted under the Fourth Amendment. DEQ only addressed Gibson's Fourth Amendment argument. In his reply memorandum, Gibson folded his lack-of-adequate-information argument back into the Fourth Amendment context by asserting that DEQ had long known about his operations, so the odor

17

complaint could not be an exigent circumstance. The district court never ruled on whether DEQ had sufficient information to instigate the proceedings.

If Gibson's narrative flourish was intended to raise the argument he now asserts on appeal, then it flew past both the opposing party and the district court. So, even if some iteration of this argument was made below, Gibson never secured an adverse ruling on the issue. *See Johnson v. Crossett*, 163 Idaho 200, 207, 408 P.3d 1272, 1279 (2018) ("Even if an issue was argued to a lower court, to preserve an issue for appeal there must be a ruling by the lower court."). Accordingly, we determine that Gibson has failed to properly preserve this issue for appellate review.

b. DEQ's investigation did not violate Idaho Code section 39-108 by failing to observe prohibitions against unreasonable searches and seizures.

Gibson argues that DEQ's initial inspection violated Idaho Code section 39-108(2) by asserting that DEQ may only enter a facility when exigent circumstances are present or it has received consent. Gibson asserts the district court should have granted the motion to strike the testimony because the Legislature intended the exclusionary rule to apply to violations of the statute. DEQ argues that the district court correctly concluded that there was no proscribed "warrantless search" within the meaning of section 39-108(2)(c). DEQ also points out that Idaho Code sections 39-108(1) and (2) only speak of "searches," not investigations or inspections.

The facts relevant to our analysis are taken from the district court's memorandum decision denying Gibson's motion. On their initial visit, Ehlert and another DEQ official drove to Black Diamond Composting, parked outside the fence, and then walked onto the property using a path for vehicles. They entered the property to locate and speak with an employee and walked along the defined pathways. Ehlert testified regarding his observations of the facility and that he did not seek a warrant. The record also shows that Gibson's property contains the following sign located at the entrance of the facility:

NOTICE

ADMISSION TO THIS PROPERTY IS Allowed **ONLY** under the following conditions:

You may deposit grass clippings, leaves, or soft green vegetation. NO branches, limbs, construction waste, or trash. NO chemicals.

Sign in with all correct information **BEFORE** you proceed.

Open 24-7 for the convenience of all lawn care professionals.

NO scavenging allowed.

This is a "CONTRACT OF ADHESION"

Thanks

Dave Gibson

At trial, Gibson moved to strike "everything [Ehlert] said relative to that unlawful warrantless search [he] conducted" under the exclusionary rule. The district court denied the motion at trial, but requested post-trial briefing and scheduled an evidentiary hearing. An evidentiary hearing took place, but neither side presented evidence.

Ultimately denying the motion, the district court did not decide whether the exclusionary rule need be applied because it concluded that no Fourth Amendment search took place. The court pointed out that Ehlert observed the facility in "open view" and that Gibson's facilities were open to the public. The district court noted that it expected some sort of consent argument based on Gibson's signs, but none arrived from Gibson, and that one was not necessary in light of the court's determination. The district court reached its decision finding the Court of Appeals' decision in *State v. Hiebert* "indistinguishable."

We agree with the district court. The Fourth Amendment to the United States Constitution and Idaho's analog under Article I, Section 17 of the Idaho Constitution prohibit unreasonable searches and seizures. Idaho Code section 39-108(2)(c) simultaneously gives DEQ authority to conduct investigations while limiting the manner in which such investigations can be conducted. The statute makes plain that this grant of authority is not to be viewed as granting a power in excess of the Fourth Amendment or section 17, Article I, of the Idaho Constitution:

> (c) All inspections and investigations conducted under the authority of this chapter *shall be performed in conformity* with the prohibitions against unreasonable searches and seizures contained in the fourth amendment to the constitution of the United States and section 17, article I, of the constitution of the state of Idaho. The state shall not, *under the authority granted by this chapter*, conduct warrantless searches of private property in the absence of either consent from the property owner or occupier or exigent circumstances such as a public health or environmental emergency;

*Id.* (emphasis added).

"Where the language of the statute is clear and unambiguous, legislative history and other extrinsic evidence should not be consulted for the purpose of altering the clearly expressed intent of the legislature." *State v. Hart*, 135 Idaho 827, 829, 25 P.3d 850, 852 (2001) (citing *City of Sun*

19

*Valley v. Sun Valley Co.,* 123 Idaho 665, 667, 851 P.2d 961, 963 (1993)). "The words must be given their plain, usual, and ordinary meaning, and the statute must be construed as a whole." *Id.* However, "[w]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." *State v. Oar*, 129 Idaho 337, 340, 924 P.2d 599, 602 (1996) (quoting *Lorillard v. Pons*, 434 U.S. 575, 583 (1978)).

Read as a whole, Idaho Code section 39-108(2)(c) dictates that if an investigation will constitute a "search" under the Fourth Amendment or its Idaho counterpart, DEQ must obtain consent from the property owner or occupier, a warrant under subsection (2)(d), or exigent circumstance must be present. Subsections (2)(c) and (2)(d) were added in 1986, *see* 1986 Sess. Laws 172, well after the adoption of the test for determining whether something was a "search" under the Fourth Amendment, including asking whether the person had a reasonable expectation of privacy in the place or thing searched. *See Katz v. United States*, 389 U.S. 347 (1967). This standard thus colors our reading of section 39-108 and its pronouncements limiting inspections and investigations.

"Under the open view doctrine, a police officer's observations made from a location open to the public do not constitute a search." *State v. Christensen*, 131 Idaho 143, 146–47, 953 P.2d 583, 586 (1998). "This is because one cannot have a reasonable expectation of privacy in what is knowingly exposed to public view." *Id.* at 146–47, 953 P.2d at 586–87 (citing *Katz*, 389 U.S. 347). When a business premises is involved, the government has "greater latitude," as the "interest of the owner of commercial property is not one in being free from any inspections." *Donovan v. Dewey*, 452 U.S. 594, 598–99 (1981).

In *State v. Hiebert*, the Court of Appeals addressed whether police officers may travel the same paths as a customer who enters a business. 156 Idaho 637, 329 P.3d 1085 (Ct. App. 2014). There, officers entered the defendant's junkyard business (where he also resided) during normal business hours via an open gate with an "Open" sign displayed. *Id.* at 639–40, 329 P.3d at 1087–88. Once on the driveway, one of the officers walked down a pathway—past a "stop" sign, a "no thru traffic" sign, and a small "no trespassing" sign—as he had found workers there on prior occasions. *Id.* at 640, 329 P.3d at 1088. Finding a stolen vehicle, the police secured a warrant to search the defendant's residence and discovered methamphetamine. *Id.* On appeal, the defendant argued that all evidence should be suppressed "because the officers did not restrict their

20

movements to the normal access routes and places where an ordinary visitor would reasonably be expected to go[.]" *Id.* at 641, 329 P.3d at 1089. The district court denied the motion and the Court of Appeals affirmed.

In analyzing the police officers' initial entrance to the junkyard, the Court of Appeals focused on the fact that the property was also a commercial business open to the public. *Id.* It reasoned that operating such a business "creat[ed] an implied—if not explicit—invitation to enter upon his property and travel in the established pathways of the business." *Id.* at 642, 329 P.3d at 1090. Thus, "the question is what an ordinary visitor to the business property, not knowing the subjective intent of the owner, would have objectively perceived as reasonable conduct." *Id.* As for the signs, the Court of Appeals reasoned that, while "[p]osting 'no trespassing'" signs may indicate a desire to restrict unwanted visitors and announce one's expectations of privacy," the "officers restricted their movements to the clearly established pathways upon which normal visitors might reasonably be expected to travel under the circumstances[.]" *Id.* at 642–43, 329 P.3d at 1090–91. Thus, more than "an ambiguous and obscure" no-trespassing sign was required to effectively revoke the implied invitation to enter the part of the property open for business purposes. *Id.* at 643, 329 P.3d at 1091.

The Supreme Court of Maine reached the same conclusion under even more analogous factual circumstances in *Dep't of Envtl. Prot. v. Emerson*, 616 A.2d 1268 (Me. 1992). There, Maine's DEQ equivalent sought to enforce its solid-waste disposal rules against a landfill operator who had nearly "12 to 14 million tires covering more than 10 of [his] 70 acres" in violation of its rules. *Id.* at 1269. In response to the defendant's suppression argument, the *Emerson* court offered a succinct analysis:

> The Superior Court found that the public had regular access to the municipal landfill located on defendant's property. The landfill is situated next to the tires and demolition debris. State officials could and did legitimately enter the landfill. A gate existed at the landfill entrance to restrict dumping during hours in which the landfill was closed, but no fence restricted access to any of the other disposal areas. Although an attendant's shack was located on the roadway between the landfill and the other disposal areas, no physical barriers, screening devices, or boundary markers separated the landfill from the remainder of defendant's property. The area covered with tires and demolition debris constituted an open field in which defendant could not reasonably expect privacy. The Superior Court did not err in refusing to suppress the evidence resulting from the entry to defendant's land.

*Id.* at 1271.

21

Here, we agree with the district court that Ehlert's investigation did not constitute a Fourth Amendment search, and thus was "in conformity with . . . the constitution of the United States and the constitution of the state of Idaho." I.C. § 39-108(2)(c). Gibson's facility was open "24/7" to those who wanted to access it. There were no physical barriers stopping Ehlert from entering the facility—in fact, arrows and signs pointed him into the facility—and he entered to find an attendant in order to conduct a more detailed inspection. Members of the public seeking to locate an employee could reasonably understand that they could enter the pathway into the facility in an attempt to locate the operator. In addition, all of the facility was an open field; windrows almost football fields in length were visible from the front gate and the road. The DEQ employees did not take samples or conduct any tests. In effect, they did what a customer seeking to talk to an employee would have done.

The only complicating factor in this inquiry is the effect, if any, of Gibson's sign. A business open to the public creates "an implied—if not explicit—invitation to enter upon [its] property and travel in the established pathways of the business." *Hiebert* at 642, 329 P.3d at 1090. Gibson's sign appears to be an attempt to limit that license. Whether a sign revokes the implied license that a business is open to the public raises an objective inquiry. *See State v. Albertson*, 165 Idaho 126, 132, 443 P.3d 140, 146 (2019). As we recently observed in *Albertson*, "trespass laws are not rooted in the same constitutional soil from whence the reasonable expectation of privacy standard has grown." 165 Idaho at 131, 443 P.3d at 145 (citing *Kyllo v. United States*, 533 U.S. 27, 34 (2001). So the test is not whether Ehlert crossed the threshold, but whether he violated a reasonable expectation of privacy when he did so. We determine that a member of the public would view Gibson's sign and determine that they were still granted a limited license to enter the property to seek out an employee. Thus, Ehlert did not violate Gibson's constitutional rights by doing so.

## F. There is substantial, competent evidence to support the district court's findings about the substance, volume, and source of the grass clippings at Gibson's facility.

Gibson argues that the observations made during the inspection failed to produce competent evidence to support any "Tier II" violation because what the DEQ agents saw was compost, humus, and dirt, rather than "solid waste." Gibson focuses his argument by alleging that there was not substantial and competent evidence admitted to prove that the facility had over 600 cubic yards of solid waste "at any one time," because compost and humus do not qualify as

22

solid waste. He also argues that the evidence regarding "post-dated" deliveries from Boise City and Ada County Highway District cannot establish the volume that existed at that time.

"Substantial and competent evidence exists 'if there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal.'" *Caldwell Land & Cattle, LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 795, 452 P.3d 809, 817 (2019) (citing *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017)). Substantial and competent evidence is less than a preponderance of evidence, but more than a mere scintilla. *Cowan v. Bd. of Comm'rs of Fremont Cty.*, 143 Idaho 501, 517, 148 P.3d 1247, 1263 (2006) (internal quotations and citations omitted). Substantial and competent evidence need not be uncontradicted, nor does it need to necessarily lead to a certain conclusion; it need only be of such sufficient quantity and probative value that reasonable minds could reach the same conclusion as the fact finder. *Id*. We conclude that the district court's factual findings are supported by substantial, competent evidence based on a few considerations.

First, we must again stress that Gibson failed to supply an adequate appellate record by neglecting to include the entire trial transcript on appeal. Gibson had an affirmative duty to provide a sufficient record to assess the district court's findings. *Estate of Ekic v. Geico Indem. Co.*, 163 Idaho 895, 898, 422 P.3d 1101, 1104 (2018) ("The party appealing a decision of the trial court bears the burden of ensuring that this Court is provided a sufficient record for review of the trial court's decision.") (citation omitted). When there is an incomplete record, "this Court will presume that the absent portion supports the findings of the trial court." *Id.* This principle is perhaps at its most important when a party alleges that the district court's findings lacked evidentiary support.

Second, even without the presumption created by Gibson's failure to compile a sufficient record, the district court's finding that Gibson's facility qualified as a Tier II facility for 2013 and 2014 is supported by substantial, competent evidence. This finding required evidence demonstrating that there was a "cumulative volume of wastes at the facility at any one time that is greater than six hundred (600) cubic yards." IDAPA 58.01.06.009.03.b. In finding that this was established, the district court found that ACHD alone "delivered 5003 cubic yards of leaves to [] Gibson's facility in 2013; 4,908 cubic yards in 2014; and 1,548 cubic yards in 2015." This finding is supported by the annual maintenance logs from ACHD that indicate the total volume of leaves deposited at Gibson's facility in each calendar year. This is evidence that "a reasonable

23

trier of fact could accept and rely upon in making the factual finding." *Caldwell Land & Cattle*, 165 Idaho at 795, 452 P.3d at 817.

Gibson's other arguments on this point fade when he claims that DEQ was required to prove that his facility qualified as a Tier II facility on the date of the "inspection." Under the Environmental Protection and Health Act, DEQ may bring a civil-enforcement action "against any person who is alleged to have violated any provision of this act or any rule, permit or order which has become effective pursuant to this act." I.C. § 39-108(3)(b). "Such action may be brought to compel compliance with any provision of this act or with any rule, permit or order promulgated hereunder and for any relief or remedies authorized in this act." *Id.* DEQ's complaint alleged that Gibson operates a Tier II solid waste treatment plant without abiding by the regulations and conditions set forth in the Solid Waste Management Rules. The Rules required that Gibson submit an operating plan and documentation demonstrating compliance. Thus, to prove a violation of the Solid Waste Management Rules for Tier II facilities (IDAPA 58.01.06.012), DEQ had to prove that Gibson was operating a Tier II facility. A Tier II facility is a "processing facility" that "has a *cumulative volume of wastes* at the facility *at any one time* that is greater than six hundred (600) cubic yards." IDAPA 58.01.06.009.03.b (emphasis added). There is substantial and competent evidence to support the finding that there was more than 600 cubic feet at any one time. Accordingly, Gibson had a duty to file an operating plan and he failed to do so. Thus, the record supports the district court's conclusion in this regard and it is therefore affirmed.

**G. The district court's findings of fact support its conclusion that DEQ had authority to regulate Gibson's facility and that Gibson violated DEQ's Solid Waste Management Rules by failing to register.**

   a. <u>The grass clippings and leaves are "solid waste" under the common definition of the term.</u>

Under the Environmental Protection and Health Act, solid waste is defined in part as "garbage, refuse, radionuclides and other discarded solid materials . . . ." I.C. § 39-103(13). The district court, relying on *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1037 (9th Cir. 2004), looked to the plain definition of the term "discarded" and determined that leaves and grass clippings are solid waste under the EPHA, even though the *Safe Air for Everyone* court held that grass residue remaining after a Kentucky-bluegrass harvest was not "solid waste" within the meaning of the Resource Conservation and Recovery Act. *Id.*

24

In *Safe Air for Everyone*, farmers in northern Idaho would accumulate and then burn the straw and stubble from trimming their bluegrass crops. *Id.* at 1038. Looking to the decisions of sister circuits and definitions of the word "discard," the *Safe Air for Everyone* court reasoned that it would "strain" the everyday usage of the term "discard" if it were interpreted to encompass materials "retained for immediate reuse." *Id.* at 1042. Synthesizing applicable case law, the court set out a three-part test to evaluate whether something is "solid waste" under the RCRA:

1. whether the material is "destined for beneficial reuse or recycling in a continuous process by the generating industry itself";

2. whether the materials are being actively reused, or whether they merely have the potential of being reused; [or]

3. whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer.

*Id.* at 1043. Because the farmers used the grass residue in a continuous cycle to the benefit of their original producers, the *Safe Air for Everyone* court held that "the bluegrass residue is not discarded, abandoned, or given up, and it does not qualify as 'solid waste' under the RCRA, based on its statutory definition of 'solid waste' as 'discarded material.'" *Id.* at 1045. Based on the *Safe Air for Everyone* analysis, the district court here concluded that grass clippings and leaves are solid waste, but reasoned that, at some point in their decomposition, they break down to create compost or humus which is not solid waste because Gibson had a use for that substance.

Gibson argues that the district court erred in failing to rule "the RCRA, 40 CFR 261.4(b)(2), and 40 CFR 261.2(e) exclude organic recyclable substances from 'solid waste.' He claims that the RCRA excludes "organic substances" used as a direct ingredient to produce a product that is a substitute for commercial products. He also argues that the district court misapplied *Safe Air for Everyone* because the only difference between the current case and the bluegrass farms, is that Gibson is not the "original owner" of the organic residue. He also claims that there is no longer a requirement that Gibson be the "original owner" because the Environmental Protection Agency has promulgated rules that specifically exclude recycled material. DEQ responds by stating that looking to the intent of the original possessor to determine whether something is discarded is consistent with Idaho case law and other federal authorities. DEQ emphasizes that Gibson is not "the original owner," so his reliance on the federal case law addressing the RCRA is misplaced because such cases reason that materials were not "discarded" when used on the same premises by the same person for a useful purpose.

25

We agree with the district court. The leaves and grass clipping are solid waste subject to DEQ regulations because they are discarded materials. These materials were not the byproduct of Gibson's operation "retained for immediate reuse." Rather, both the ACHD and Boise City testified that that each organization took the leaves and clippings to Gibson's facility to get rid of them. Boise City paid a modest fee to do so and both organizations testified that neither had use for the leaves or clippings. That Gibson may have desired the leaves does not change whether the leaves and grass clippings constituted discarded material under the Act. Those who brought the leaves had no more use for them, and would have taken them to a landfill if not for Gibson's facility, and, thus, ACHD and Boise City discarded the leaves in the ordinary sense of the word.

Gibson also argues that EPA regulations have now abrogated the Ninth Circuit's focus on the intent of the person discarding the item in favor of an objective standard. There is no merit in this argument. First, it is based on the notion that the "broader or more stringent" feature of the ISWFA applies. As explained, the ISWFA applies only to municipal solid waste facilities and Gibson's facility is not a municipal solid waste facility. Second, 40 CFR 261.2(e) applies to solid waste that is determined to be hazardous. There is a fork in the regulatory road for hazardous and nonhazardous wastes, and the EPA regulations apply different definitions to each. Thus, 40 CFR 261.2(e) has no bearing on Gibson's facility because the facility does not handle hazardous waste.

Lastly, Gibson argues that grass clippings and leaves are not solid waste because the decomposition process is "instantaneous" and because grass and leaves are composed largely of water, making them more of a liquid or a plasma. These arguments are not supported in the record or in the briefing by legal authority. Therefore, we will not address them. *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010); *see also* I.A.R. 35(a)(6) ("The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to authorities, statutes and parts of the transcript and the record relied upon.").

b.  Grass clippings and leaves do not fall under DEQ's Solid Waste Management Rules as crop (plant) residue.

Gibson argues that grass clippings and leaves are excluded from "solid waste" in the Solid Waste Management Rules under IDAPA 58.01.06.001.03(b)(ii). "Administrative rules are interpreted the same way as statutes." *Idaho Power Co. v. Tidwell*, 164 Idaho 571, 574, 434 P.3d 175, 178 (2018). The full text of this IDAPA exclusion provides:

26

Wastes Not Regulated Under These Rules

> b. These rules do not apply to the following solid waste unless these wastes are mixed with more than incidental quantities of regulated waste;
>
> . . .
>
>> ii. Manures and crop (plant) residues ultimately returned to the soils at agronomic rates;

IDAPA 58.01.06.001.03.b.ii.

While Gibson asserts that grass clippings and leaves are "plant residue," we cannot accept this strained view of the rule. The parenthetical "plant" is used to specify the crop type, not give a new category of residue. The term "crop residue" is defined by the United States Department of Agriculture to mean "[a]ny organic matter left in the field after the harvest of a crop, e.g. leaves, stalks, stubble, roots, hulls." The agricultural focus of the provision is confirmed by the term "agronomic rates." The phrase "ultimately returned to the soils at agronomic rates" plainly means returning the residue to the soil that grew the original plant. This provision is aimed at excluding large-scale agricultural operations from inadvertently falling under the purview of the Rules by simply harvesting crops, such as the commercial grass growers in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004). Gibson's facility harvests no plants, and thus is not returning raw materials to the soil. Nor is there any suggestion that he does so at an agronomic rate. This exception does not apply.

> c. Gibson has not shown that the authority to regulate compost is vested with the Department of Agriculture or that compost falls under the Soil and Plant Amendment Act.

Gibson contends that the authority to regulate organic compost ingredients is vested with the Idaho Department of Agriculture. He contends that the Legislature adopted a "clarification amendment" to this effect in 2011 to place composting facilities within Idaho Code section 22-4502 (the Right to Farm Act), as result of Ada County's litigation with Gibson's prior facility. He also argues that the Soil and Plant Amendment Act places the regulation of organic recyclable substances under the Department of Agriculture's authority. He claims that this law existed prior to DEQ forming in 2000, so there was no grant of authority to DEQ to regulate any of the established agricultural activities under Idaho Code section 39-102(A)(2).

We hold that the Right to Farm Act does not apply. Gibson is correct that it provides that an "agricultural operation" means "an activity . . . that occurs in connection with the production of agricultural products . . . other lawful uses, and includes, without limitation . . . plant waste

27

and plant compost[.]" I.C. § 22-4502(2)(d). The purpose of this Act was to prohibit private nuisance claims against farming activities, and thus has no bearing on solid-waste management. I.C. § 22-4501 ("It is the intent of the legislature to reduce the loss to the state of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance."). The Right to Farm Act only prohibits political subdivisions from declaring farms a nuisance, so, even if DEQ qualified as a political subdivision, it is not attempting to declare Gibson's operation a nuisance.

Likewise, the Soil and Plant Amendment Act does not apply. That Act provides the Idaho Department of Agriculture with the authority to implement a system to regulate soil and plant amendments, namely their "proper use, handling, transportation, storage, display, distribution, sampling, records, analysis, form, minimum percentages, soil amending or plant amending ingredients, exempted materials, investigational allowances, definitions, labels, labeling, misbranding, mislabeling and disposal of soil amendments and plant amendments and their containers." I.C. § 22-2204. While the Act might present some overlapping authority over the final "compost" or "humus" product, it has no bearing on solid-waste management up to the point that the final product would be packaged and placed into the stream of commerce.

     d.  <u>The grass clippings and leaves do not fall under the exclusion in the Solid Waste Management Rules for "agricultural solid waste managed by the Department of Agriculture."</u>

Gibson also argues that his facility falls under the Solid Waste Management Rules' exclusion for agricultural solid waste and that the authority to regulate compost is vested entirely with the Idaho Department of Agriculture. Provided in context, the Rule states:

> b. These rules do not apply to the following solid waste unless these wastes are mixed with more than incidental quantities of regulated waste[:]
>
> > iii. Any agricultural solid waste which is managed and regulated pursuant to rules adopted by the Idaho Department of Agriculture. The Department reserves the right to use existing authorities to regulate agricultural waste that impacts human health or the environment.

IDAPA 58.01.06.001.03.b.iii.

Even though Idaho Code section 22-110(1) grants the Department of Agriculture the authority to regulate "agricultural solid waste, agricultural composting, and other similar agricultural activities," the Department of Agriculture's rules on "agricultural waste" only

address livestock waste. Even granting Gibson the fact that he received some materials from farmers, his operation is only tangentially related to agriculture. The grass clippings and leaves received from municipal sources and landscapers are not waste from an agricultural activity and do not comprise "agricultural solid waste" because there is no agricultural component to this material. Even if there is some overlap in regulatory authority regarding organic matter composting, Gibson has failed to cite any regulations promulgated by the Department of Agriculture regarding compost that would have applied to his facility. This argument is unpersuasive.

## H. The district court did not err by assessing penalties, or by awarding injunctive relief and expenses.

Gibson's only argument assailing the district court's remedies is based on assertions of legal and factual error in its decisions giving rise to this appeal. Because we find no error in the district court's decision, we affirm its award of penalties.

## I. Whether either party is entitled to attorney's fees on appeal.

Both parties seek attorney's fees on appeal under Idaho Code sections 12-121 and 12-117. Idaho Code section 12-117 governs because DEQ is a state agency. *See Hobson Fabricating Corp. v. SE/Z Const., LLC*, 154 Idaho 45, 52, 294 P.3d 171, 178 (2012). Accordingly, section 12-121 is not applicable because section 12–117 "is the exclusive means for awarding attorney fees for the entities to which it applies." *Nemeth v. Shoshone Cty.*, 165 Idaho 851, 861, 453 P.3d 844, 854 (2019) (quoting *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 635, 226 P.3d 1277, 1282 (2010)).

The portions of section 12-117 relevant here are:

(1) Unless otherwise provided by statute, in any proceeding involving as adverse parties a state agency or a political subdivision and a person, the state agency, political subdivision or the court hearing the proceeding, including on appeal, shall award the prevailing party reasonable attorney's fees, witness fees and other reasonable expenses, if it finds that the nonprevailing party acted without a reasonable basis in fact or law.

(2) If a party to a proceeding prevails on a portion of the case, and the state agency or political subdivision or the court hearing the proceeding, including on appeal, finds that the nonprevailing party acted without a reasonable basis in fact or law with respect to that portion of the case, it shall award the partially prevailing party reasonable attorney's fees, witness fees and other reasonable expenses with respect to that portion of the case on which it prevailed.

29

I.C. § 12-117. Because Gibson has not prevailed on appeal, we determine that the Gibson is not entitled to attorney's fees on appeal under section 12-117.

DEQ, as the prevailing party, may come within the purview of section 12-117. Even so, the question remains whether section 12-117 allows courts to award attorney's fees on a claim-by-claim, or issue-by-issue basis—a question that we have never answered.

We agree with DEQ that Gibson's 16-issue appeal fails to comply with the format requirements of Idaho Appellate Rule 36(b)[2], improperly relies on material outside the record, and that some arguments "have no basis in reality, much less the record." And, DEQ is correct to point out that in *Baughman v. Wells Fargo Bank, N.A.*, this Court elected to award attorney's fees on a claim-by-claim basis when the case had but one meritorious issue and many frivolous ones. 162 Idaho 174, 183, 395 P.3d 393, 402 (2017). However, that case dealt with Idaho Code section 12-121 which is not at issue here.

The question is whether we may treat attorney's fees awards under section 12-117 similarly. We conclude that we may, and we will in this case. Section 12-117(2) demonstrates an intent by the Legislature to separate claims in an appeal by referring to "portion[s] of a case" and makes clear that a court must take into account the basis for such claims when assessing attorney's fees. *See id.* (noting that a court must award fees if it "finds that the nonprevailing party acted without a reasonable basis in fact or law *with respect to that portion of the case . . . .*").

Because Idaho Code section 12-117 mandates an award, and authorizes apportioning of fees, DEQ is entitled to fees as set forth below. Recognizing the high bar it takes for a court to conclude that an issue was pursued "without a reasonable basis in law or fact[,]" the following issues rise to that level. First, whether Idaho Code section 39-108(4) is a statute of repose is resolved by the plain language of the statute. Second, whether DEQ had adequate information to conduct its initial inquiry is also resolved by the plain language of the statute and factual record produced. Third, whether DEQ could only present evidence about the amount of solid waste at the facility on the date of the inspection is resolved by the plain language of the regulation. Fourth, Gibson's argument that there is not substantial, competent evidence to support the finding that Gibson was operating a Tier II facility is without factual basis in the limited record

---

[2] Rule 36(b) governs the proper standards applicable to the printing of briefs.

available. Fifth, Gibson's argument that grass clippings and leaves are not "solid" waste has no basis in law, fact, or common sense. Sixth, the same reasoning applies to his argument that his composting process is instantaneous. Lastly, whether the Right to Farm Act and the Soil and Plant Amendment Act apply is settled by the plain language of the statutes and Gibson produced no facts or law to suggest otherwise.

All other arguments, in spite of Gibson's meandering and frustrating briefing, have some basis in law or fact whether it is because of a complex statutory scheme, a novel issue, or a reasonable challenge to an issue that has vexed other courts.

## V.    CONCLUSION

For the reasons outlined above, we conclude that this Court has jurisdiction to hear this appeal. We affirm the judgment of the district court, and award costs and partial attorney's fees to DEQ.

Justices BRODY, BEVAN, STEGNER, and MOELLER **CONCUR.**